[No. 594-1.    Division One—Panel 1.    July 12, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. GARY WAYNE TOLIVER, *Appellant*.

*Robert A. Castrodale,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *Patricia G. Harber, Deputy,* for respondent.

HOROWITZ, C.J.—Defendant was convicted on two counts of burglary in the second degree and one count of grand larceny by possession. He appeals.

The facts as the jury might have found them are these.[1] That on August 19, 1969, federal Officer Donald E. Madsen of the Alcohol and Tax Division of the United States Treasury Department received word from a reliable informant that one Gerald Speaks, who was wanted on a federal warrant for sale of a machine gun, could be found at 13444 N.E. 100th, Kirkland, the house where Speaks was living.

---

[1] The findings of the court at the CR 101.20W hearing well summarize the facts of the case as the jury might have found them in a trial on the merits.

Officer Madsen was further told that the people in the house with Gerald Speaks would have guns and would resist any attempt to arrest him. Officer Madsen requested Detective Vincent Pellegrini and other members of the King County Department of Public Safety to assist him in making the arrest. Detective Pellegrini had also been given information by a reliable informant on the same day that Gerald Speaks could be located at the same house in Kirkland, and that there would be others in the house with guns who would try to prevent Speaks' arrest.

At 8 p.m. on August 19, 1969, federal Officers Madsen and Vissard and Detectives Pellegrini and Warwick, together with uniformed officers of the King County Department of Public Safety, went to 13444 N.E. 100th, Kirkland, and arrested Speaks in his car, which was directly off the porch of the house. At this time, one Stephanie Vasiliou, who was standing outside the car with Speaks, began screaming. The open front door of the house was slammed shut and sounds of running could be heard from inside the house. Officer Pellegrini yelled that they were police officers and to come out. About that time the defendant Toliver jumped out of an upstairs window and began running around the roof of the house. He was told to come down off the roof, which he did. The officers were informed there was one more man in the house. They believed it was necessary for their safety and protection that the house be cleared of people who were in a position to fire at them as they left with their prisoner. At this time Detective Pellegrini again yelled for the person in the house to come out, and obtaining no response, entered the house through the front door in order to secure the downstairs.

While in the house on the downstairs floor, Detective Pellegrini found a .38 caliber revolver lying on a chair in the living room. He then checked the bedroom for the person still in the house and then the kitchen. In the kitchen he observed a typewriter and check protector fitting the description of the one Detective Kringen had told him about earlier in the afternoon as having been stolen

from Maddy's Automotive Service the night before. Detective Pellegrini then left the house. Meanwhile, Officer Madsen had crawled in an upstairs window and found another man, one Baldur Odin Svararsson, lying underneath a bed. Svararsson was brought outside the house where the officers waited while Detective Kringen was summoned to the scene. After he arrived it was decided that the check protector had been stolen and that, consequently, a search warrant should be obtained. No search was made of the house until after Detective Pellegrini obtained a search warrant for stolen property in the Kirkland house and had returned to the scene at approximately 11:40 p.m. that night. By use of the search warrant the items of property described in burglary count 2 and other items were seized. The items, together with the suspects Toliver and Svararsson, were transported to the King County Courthouse and jail. In due course, the evidence concerning the circumstances of the seizure and the items taken pursuant to the search warrant were introduced in evidence. An additional statement to the extent material will be hereinafter made.

Defendant made a motion to suppress the evidence seized pursuant to the search warrant on the ground that the officers had no right to enter the Kirkland house following the arrest of Speaks before obtaining a search warrant. It is contended that what the officers did constituted a general search for the purpose of obtaining evidence, contrary to law. They cite cases such as *Agnello v. United States*, 269 U.S. 20, 70 L. Ed. 145, 46 S. Ct. 4 (1925). More recently the Supreme Court of the United States has placed certain spatial and temporal limitations upon warrantless searches and seizures on and after June 23, 1969. *Chimel v. California*, 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969); *Williams v. United States*, 401 U.S. 646, 28 L. Ed. 2d 388, 91 S. Ct. 1148 (1971). *See* Note, 19 Am. U.L. Rev. 575 (1970). *See also*, Note, 78 Yale L.J. 433 (1969.), for a discussion of the pre-*Chimel* law. Under *Chimel*, warrantless searches and seizures incident to an arrest are limited to the arrestee's person to discover and remove weapons

and to seize evidence to prevent its concealment or destruction from the area "within the immediate control" of the person arrested, that is, the area from which he might gain possession of weapons or destroy evidence.[2] *Chimel* did not involve the problem of the dwelling area, not necessarily within the arrested person's control, but in which armed persons were hiding whom the officers had reasonable cause to believe might fire upon them when they left with the arrested person.

The rules set forth in *Chimel* govern only search and seizure of property incident to a lawful arrest; they are not applicable to entry and search of a dwelling for the purpose of finding and detaining a person thought to pose a threat to the safety of officers lawfully performing their duties. However, the fundamental principle underlying *Chimel*—that officers have a right to assure their safety—is of general applicability, and, for example, underlies the court's approval of "stop and frisk" in *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). As was stated by the court in *Terry*:

> [T]here is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." . . . And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.

(Footnote omitted.) 392 U.S. at 21. That it is reasonable for officers to take necessary steps to protect themselves was made clear by the court:

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close

---

[2]The *Chimel* doctrine was reaffirmed in *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971), in an opinion filed June 21, 1971. *Coolidge* does not specifically discuss the problem in the instant case. However, its discussion of "exigent circumstances," including the plain sight exception to the search warrant requirement, is consistent with and serves to support our holding here.

range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

392 U.S. at 24.

Consequently, we conclude that, although the self-protective action in the instant case went beyond the limited stop and frisk permitted by *Terry*, the above-quoted principles, upon which the holding in *Terry* was based, are properly extended to cover the situation where officers lawfully executing an arrest warrant have a reasonable fear that friends or confederates, who are beyond the area within immediate control of the arrestee and within a constitutionally protected dwelling, might begin shooting, or take action which otherwise endangers the safety of the officer. *See People v. Block*, 16 Cal. App. 3d 140, 93 Cal. Rptr. 779 (1971); *People v. Machel*, 234 Cal. App. 2d 37, 44 Cal. Rptr. 126, *cert. denied*, 382 U.S. 839, 15 L. Ed. 2d 81, 86 S. Ct. 88 (1965). If the arresting officer, although having reasonable cause to apprehend being shot at by nearby friends or confederates beyond the immediate control of the arrestee, is not permitted to search out such persons to protect himself in the performance of his duty to arrest the arrestee, we would quickly impair and even destroy the possibility of an arrest at all.

The principle that officers are entitled to take action to protect themselves must necessarily be tempered, however, by a respect for the personal security and privacy of individuals which is secured by the Fourth and Fourteenth Amendments. If a confederate or friend of an arrestee is to be detained, or a search made of his house to effect his detention, the Fourth Amendment, at the minimum, requires that the officers have reasonable cause to believe that, in carrying out their duty to arrest, their safety would be endangered, *i.e.*, the question is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

*Terry v. Ohio, supra* at 27. It is not necessary that the police have probable cause to arrest the friend or confederate for a crime; such a requirement would unduly burden police in taking action to assure their safety. However, such self-protective action requiring the warrantless entry into a dwelling, absent exigent circumstances excusing compliance with the requirement, can be undertaken only after the person or persons within fail to comply with the demand, by an officer who identifies himself as such, that such persons come out. Moreover, both the intrusion made by the officers and the subsequent detention of the person thought to be dangerous must be no greater than that which is required to secure the officers' safety. Consequently, any search of a dwelling undertaken to find and detain a person thought to be therein, must be strictly limited to that which is necessary to ascertain the whereabouts of the person or persons thought to be inside so that they can be detained and searched for weapons. And, any detention of such a person must be limited to that which is necessary to allow the officers to safely perform their duties, unless, as in the instant case, facts come to the officers' attention during the process which give them probable cause to arrest the person detained.

In the instant case the officers had ample basis upon which to form a reasonable belief that their safety was threatened by the person inside. Gerald Speaks, the man whom the officers came to arrest, was wanted for unlawful sale of a machine gun, and the reputably reliable informer who told officers of Speaks' whereabouts advised the officers that the persons in the house with Speaks would have guns and would resist any attempt to arrest him. When, in addition, the arrival of the officers and arrest of Speaks in the front yard set off such a commotion, followed by an unheeded warning to come out of the dwelling by officers who identified themselves as such, there can be little doubt that there were reasonable grounds for the officers to believe the person whom they were told was inside posed a threat to their safety. Moreover, the scope of

the search conducted was strictly limited to that necessary to find the person inside and take him into custody, and when in the lawful course thereof, objects which appeared to have been stolen came into the officers' view, they had probable cause to arrest the friends of Speaks, including the defendant, and were thus justified in detaining the suspects longer than was necessary to effect the officers' safety.

The officers, being lawfully in the house to apprehend and disarm those within so as to secure themselves from being shot at, were not required to close their eyes and ignore items of possible evidentiary value which were in plain sight. *See State v. Hackett*, 4 Wn. App. 360, 481 P.2d 466 (1971); *State v. Regan*, 76 Wn.2d 331, 457 P.2d 1016 (1969). The officers might have seized the items so seen, including the items described in count 2. Instead the officers delayed any seizure until they obtained a search warrant. The trial court ruled the evidence admissible. We find no error in such ruling.

Defendant next contends that evidence concerning the fair market value of the check protector, typewriter and radio stolen from Howard T. Maddy was insufficient to show that they had a value in excess of $75. Evidence introduced without objection showed that the replacement cost of the check protector was around $150; that the check protector was in very good working condition and had been in the owner's possession for about 8 to 9 years. The owner testified that it was worth $150. He also testified that the value of the typewriter was approximately $100, and that it was in very good condition; and also that the radio had a value of $25; that he had owned it for 5 or 6 years and that it was in good working condition. It is true that on cross-examination the owner testified that he did not know for what sum the check protector, typewriter or radio could be sold. However, such testimony on cross-examination went only to the weight of his testimony, not its prima facie sufficiency. *See State v. Melrose*, 2 Wn. App. 824, 470 P.2d 552 (1970). We find no error.

■ Defendant contends the court erred in giving instruction 8,[3] governing admissibility of confessions. Defendant excepted to the second paragraph. As we understand defendant's contention, he claims that the reference to "inducement" in the instruction should have been more appropriately characterized as "threat"; but that in any case even a voluntary inducement in the nature of a favor promised destroys the voluntary character of a confession; and finally, that the phrase in the instruction "such as for instance not prosecuting some person for a crime," is an unlawful comment on the evidence. We think none of these contentions are well taken. If defendant wished a different or more detailed definition of inducement, he should have proposed one correctly phrased (*State v. Mayner*, 4 Wn. App. 549, 483 P.2d 151 (1971); *Hunt v. King County*, 4 Wn. App. 14, 481 P.2d 593 (1971)), and then upon refusal assign error here. Furthermore, an inducement in the nature of a promised favor does not automatically destroy the voluntariness of a confession. RCW 10.58.030. Finally, the phrase criticized in the context used was merely a statement of a rule of law rather than a statement by the court of his own view of the evidence. This analysis is consistent with the first phrase of the sentence immediately following the quoted language. It reads: "If you believe such promise was made in this case . . ." We find no error.

■ Defendant next contends that the court improperly granted the witness Baldur Svararsson the right to invoke

---

[3] "A confession should not be given any consideration by you unless you unanimously find that the confession was voluntarily made and that the defendant in making it was first informed of his constitutional right to remain silent if he wished and that he was entitled to the benefit of advice from a lawyer at all times. A confession even if admittedly true cannot be used to prove guilt unless it was voluntarily made.

"A confession made under inducement may be considered by you. By inducement is meant promises to do a favor for the accused, such as for instance not prosecuting some person for a crime. If you believe such promise was made in this case, you should scrutinize the confession with great care and caution so as to avoid any possible chance that one should be convicted on evidence of a confession which is not true."

the Fifth Amendment, thereby depriving defendant of the benefit of his testimony. At the time that Mr. Svararsson was produced as a witness, he was awaiting trial out of charges arising from the same burglaries with which the defendant was charged. Mr. Svararsson's personal attorney, present at the trial when he was on the stand, objected to the testimony on the ground that there was danger of self-incrimination. The witness declined to testify, asserting his Fifth Amendment privilege. The court upheld the objection. Assuming without deciding that such an error is reviewable on behalf of the defendant (*see* 58 Am. Jur. *Witnesses* § 83 (1948)), the rule is that if the question prima facie appears to be incriminatory, the witness is the sole judge of whether the answer would in fact incriminate him, and the witness' objection should accordingly be upheld. Doubts should be resolved in favor of the witness. *In re Stewart,* 121 Wash. 429, 209 P. 849 (1922). *See Hoffman v. United States,* 341 U.S. 479, 95 L. Ed. 1118, 71 S. Ct. 814 (1951). We find no error.

Defendant finally contends that the court erred in not dismissing count 3 of the amended information on the ground that the defendant was not timely arraigned on that count. We find no error. The evidence shows that on January 9, 1970, the state filed an amended information which charged the defendant with two counts of burglary in the second degree and one count of grand larceny. The amended information had added count 3, which charged burglary of Lano's Prime Rib Restaurant. The deputy prosecuting attorney set up an arraignment on the amended information for January 19, 1970, and notified counsel for the defendant. On January 19, 1970, defendant did not appear and his whereabouts was unknown. Counsel so informed the court. A bench warrant was then issued for his arrest on that date and a $3,000 bond set. Trial was set for January 26, 1970. On the eve of that trial, defendant's counsel requested a continuance until he could consult with the defendant and prepare for trial. The case was continued for trial until March 16, 1970. Well in advance of that trial

date, defendant's counsel was given a copy of the amended information, along with a copy of the written statement, given to police officers, in which defendant confessed to committing the two burglaries, including the one described in the third count. When the trial actually commenced on March 16, 1970, defendant was formally arraigned and pleaded not guilty.

A defendant is undoubtedly entitled to reasonable notice of a new count charging him with a crime so as to enable him to plead and prepare for trial; and in the event he is denied such notice to his prejudice, he is entitled to a new trial following conviction. However, if there is no prejudice there is no reversible error. *State v. Lane*, 37 Wn.2d 145, 222 P.2d 394 (1950); *State v. Nilnch*, 131 Wash. 344, 230 P. 129 (1924). In the instant case, defendant knew the facts of the burglary charged in count 3 and had stated what they were in his written statement. His counsel states in appellant's brief that he was not prejudiced by the arraignment delay. He not only had a copy of the amended information well before trial, but a copy of defendant's own statement admitting the crime. Furthermore, defendant's remedy in event of prejudice was to move for a continuance, not for dismissal as was the case here. Under the circumstances reviewed, we find no prejudice.

The judgment is affirmed.

UTTER and WILLIAMS, JJ., concur.