[No. 2563-1.　Division One.　January 6, 1975.]

THE STATE OF WASHINGTON, *Respondent*, v. DEWITT ALVIN HARRIS, *Appellant*.

*Demco & Erickson* and *John W. Demco*, for appellant.

*Christopher T. Bayley, Prosecuting Attorney,* and *Edward L. Douglas, Jr., Deputy,* for respondent.

SWANSON, C.J.—Dewitt Alvin Harris appeals from the judgment and sentence entered following a jury verdict convicting him of possession of heroin in violation of the Uniform Controlled Substances Act, RCW 69.50.

The primary issue presented is whether the known propensity of an accused to destroy evidence silently by swallowing it may constitute an "exigent and necessitous circumstance" such that a police officer bearing a lawful search warrant may enter the premises to be searched after knocking and announcing his office, but without either announcement of his purpose or refusal of admittance. Appellant mounts a two-pronged attack upon the denial of his motion to suppress the evidence obtained in the search. He claims first, that the affidavit offered to support the issuance of the search warrant is insufficient and, second, that the execution of the warrant itself was illegal.

The search warrant was issued by the Seattle District Court on February 10, 1972, on the basis of a complaint and supporting affidavit by Seattle Police Sergeant Robert Beveridge. In lieu of a detailed summarization of these documents, we have set them forth in an appendix to this opinion. Essentially, the affidavit recites circumstancse under which three reliable informants advised Sergeant Beveridge or other police officers of alleged activities of the appellant involving the possession and sale of heroin, and includes affiant Beveridge's statement that on the basis of such information, he believed that heroin was located in

rooms 406 and 406A of the Century House Motel in Seattle, and therefore he was seeking a search warrant for such premises on the day in question.

In challenging the sufficiency of the affidavit, appellant points out that much of the information contained in it does not come from the affiant's personal knowledge but rather is information supplied by an informant. Appellant basically contends that the affidavit fails to set forth the underlying facts and circumstances which would permit a magistrate to judge independently the reliability of the informant and that therefore the affidavit falls short of the requirements of *Spinelli v. United States*, 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969) and *Aguilar v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964). Appellant argues that the affidavit compounds hearsay particularly because it contains no showing that the informant had ever been inside room 406 of the Century House Motel so that there was nothing more than mere suspicion that contraband was on the premises. Finally, appellant complains that the issuing magistrate made no inquiry of Sergeant Beveridge about the sources of the information contained in the affidavit and the underlying facts and circumstances relating to the informant's reliability.

█ We stated in *State v. Peterson*, 3 Wn. App. 946, 947, 478 P.2d 745 (1970):

> While the issuing magistrate may draw common sense inferences from the facts and circumstances contained in the affidavit, see *United States v. Ventresca*, 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741 (1965), there must be a substantial factual basis for the ultimate conclusion that the items sought are probably located at the place to be searched.

(Citations omitted.) In short, it is our task to determine whether probable cause existed to issue the warrant here in question. In this connection, we are aided by the recent opinion of our State Supreme Court in *State v. Patterson*, 83 Wn.2d 49, 515 P.2d 496 (1973), in which it was said at page 52:

Reasonableness is the key ingredient in the test for issuance of a search warrant. That is precisely what the federal constitution says and our state constitution necessarily implies. Do the documents or testimony supporting the warrant give a fair-minded, independent judicial officer, on considering all of the facts and circumstances set before him on oath or affirmation, good reason to issue the warrant?

Good reason for the issuance of a search warrant does not necessarily mean proof of criminal activity but merely probable cause to believe it may have occurred. *Beck v. Ohio*, 379 U.S. 89, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964). Suspicion, belief and guess alone are not enough. If the affidavit contains none of the underlying facts or circumstances from which the magistrate can find probable cause and is no more than a declaration of suspicion and belief, it is legally insufficient.

(Citation omitted.) *See also State v. White*, 10 Wn. App. 273, 518 P.2d 245 (1973). The *Patterson* court quoted with approval from *United States v. Ventresca*, 380 U.S. 102, 108, 13 L. Ed. 2d 684, 85 S. Ct. 741 (1965), as follows at page 54:

[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by non-lawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

. . . Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invali-

date the warrant by interpreting the affidavit in a hyper-technical, rather than a commonsense, manner.

The court then concluded in *Patterson* at page 55:

> Thus, when all of the circumstances as related under oath to the issuing magistrate are considered, the question of probable cause is reduced to whether there is a "substantial basis" for the warrant.

■ When the affidavit involved in the case at bar is viewed in light of the foregoing, it is apparent that it provided a substantial basis for the magistrate to issue the search warrant. We disagree with appellant's contention that Sergeant Beveridge's statements in the affidavit, indicating that the appellant had been observed delivering heroin and that a number of persons had been observed going to and from the motel rooms in question, do no more than raise mere suspicion. As our State Supreme Court perceptively observed while upholding an arrest for probable cause in *State v. Poe*, 74 Wn.2d 425, 429, 445 P.2d 196 (1968):

> An officer of a narcotics detail may find probable cause in activities of a suspect and in the appearance of paraphernalia or physical characteristics which to the eye of a layman could be without significance. His action should not, therefore, be measured by what might or might not be probable cause to an untrained civilian passerby, but by a standard appropriate for a reasonable, cautious, and prudent narcotics officer under the circumstances of the moment.

(Citation omitted.) Similarly, magistrates issuing a search warrant may draw commonsense inferences from the facts and circumstances contained in a supporting affidavit, and their determinations of probable cause will be treated with deference by reviewing courts. *State v. Patterson, supra; State v. Hodge*, 5 Wn. App. 639, 490 P.2d 126 (1971). The trial court correctly denied the motion to suppress insofar as it was based upon the claimed inadequacy of the supporting affidavit.

■ The second prong of appellant's challenge to the

search warrant—the legality of its execution—presents a more difficult question. In *Ker v. California*, 374 U.S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963), the requirement that police officers announce their identity and purpose prior to making a forcible entry into a citizen's residence was raised to constitutional status. In *State v. Young*, 76 Wn.2d 212, 455 P.2d 595 (1969), our State Supreme Court interpreted *Ker* to mean that, subject to a federal constitutional "requirement of reasonableness," each state is free to develop its own rules to meet the practical demands of local law enforcement, and the *Young* court stated at page 215:

> It is manifest that the constitutions and statutes[1] require that entry to make an arrest or search must be lawful. In most cases, lawful entry is conditioned upon announcement of identity and purpose, and a demand for admittance. On the other hand, however, the conditions cannot be rigid and inflexible or they become an empty formality. The conditions are part of a criteria of reasonableness and subject to certain exceptions generally recognized.

In *Ker*, where the police entry was upheld, even the four justices who believed the "reasonableness" standard had been violated, recognized exceptions to the Fourth Amendment's proscription against unannounced police intrusion:

> (1) where the persons within already know of the officers' authority and purpose, or (2) where the officers are justified in the belief that persons within are in im-

---

[1] The *Young* court indicated at pages 212-13 that the applicable statutory and constitutional provisions were:

U.S. Const. amend. 4:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . .

Const. art. 1, § 7:

> Invasion of Private Affairs or Home Prohibited. No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

And RCW 10.31.040:

> To make an arrest in criminal actions, the officer may break open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure, if, after notice of his office and purpose, he be refused admittance.

minent peril of bodily harm, or (3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted.

*Ker v. California, supra* at 47.

In this connection, the State Supreme Court observed in *Young*, at page 215:

Existence of a condition justifying a possible exception to the rule cannot be based upon an ambiguous act for it does not transform vague suspicion into probable cause.

Further, the *Young* court quoted with approval and at length from *State v. Smith*, 37 N.J. 481, 181 A.2d 761 (1962), including this sentence at page 216:

Moreover, in striking a balance between the right of the State and the rights of the individual, the need to protect the innocent is not a conspicuous factor; for, as we have said, the hypothesis includes the existence of probable cause and indeed a reasonable basis to believe a criminal event is in progress.

Finally, the court in *Young* held at page 217:

To require strict compliance with a "knock and wait" rule in the execution of search warrants, no matter what the circumstances, would hamper the orderly enforcement of criminal law.

Accordingly, we hold that when officers come armed with a valid search warrant, forcible entry without announcement of identity and purpose and a demand for admittance *may* be justified when exigent and necessitous circumstances exist, as in the instant case.

In the case at bar, the trial court's oral ruling indicates that the court believed the following testimony by Sergeant Beveridge describing the execution of the search warrant:

Q Now, after you secured the keys from the manager and proceeded to the fourth floor, what action did you take? A We approached Room 406, or Suite 406. I knocked on the door and said, "Police." We did not receive any response. And I waited a brief period of time,

and I directed Detective Poindexter to unlock the door. Q Would you estimate how long you waited from the original knock to the point that the door was opened? A As I say, it was a very brief period of time. I would estimate sometime probably between 30 and 45 seconds. Q During that period of time were you aware of any activity in the room? A No, sir, I heard nothing. Q How many times did you knock? A Well, I don't know what you mean, how many times did I knock. As I recall, my original knock consisted of probably three or four knocks. on the front door. I didn't knock after that. Q And then Detective Poindexter opened the door? A With the key, yes, sir.

The State concedes that the police officers gave no announcement of their purpose and heard no sounds indicating that destruction of evidence was taking place prior to making their entry of appellant's motel room; consequently, the appellant argues, based upon *State v. Young, supra,* and subsequent cases, that the execution of the search warrant was unlawful and therefore the evidence thereby obtained should have been suppressed. The State contends, however, that testimony in this case indicates that the police had prior knowledge of the appellant's propensity to swallow evidence when confronted by police. Sergeant Beveridge testified:

Q Were you aware of any episodes during that time at which time Mr. Harris had disposed of suspected heroin? . . . A Yes, sir. There was one occasion—well, there were several occasions. Like I say, we had had him under almost constant surveillance. We had watched his activities, the various locations where he was located, the various people that had visited him. A lot of these people were known to us as addicts. And on one occasion we became [aware] he was going to make a delivery. We intercepted him, some of my detectives did. They stopped to question him and he was what we thought was chewing gum, and from a very reliable informant we found later that at that time it wasn't gum, that it was actually a condom of heroin which he had swallowed.

Although the trial court did not enter formal findings of fact or conclusions of law at the suppression hearing, the

court evaluated the legality of the unannounced search in its oral ruling as follows:

> Here I think the evidence establishes that there was compliance with everything except the announcement of purpose by the officers and I feel that in view of the evidence of the prior activities, the nature of the drug that was involved, that is, heroin, the knowledge of the police officers that heroin as a drug is easily disposed of and commonly disposed of by swallowing, that had there been an announcement of purpose here the risk of the evidence being destroyed would have been great and that this factor did justify the officers in not announcing their purpose. It takes into account that the officers do have experience with a particular type of offense—that was established by the evidence—*and that they had reason to believe that Mr. Harris in particular would attempt to destroy the evidence.* Without being able to tell in any way from the outside whether this was occurring or not, the announcement of purpose would not be required because of the risk that it would present. If the only method of destroying the evidence was by flushing it down the toilet, then that might be a different situation. *But here there was specific knowledge that it might be destroyed by swallowing, which would be entirely silent and not in any way detectable from the outside.*

(Italics ours.) The State apparently recognizes that the trial court's ruling presents a new application of the "exigent and necessitous circumstances" rule as it has been interpreted in Washington, but argues that it may be sustained under the rationale articulated by the California courts; specifically, the State urges that we approve the following language in *People v. De Santiago,* 71 Cal. 2d 18, 28-29, 453 P.2d 353, 76 Cal. Rptr. 809, 815 (1969):

> Moreover, the particular reason for entry [of a premises for purpose of a search] must be based upon the specific facts of the case. Thus, *where officers have obtained particular information which leads them to reasonably conclude that the occupants of an apartment or residence have specifically resolved to effect disposal in the event of police intrusion or have made specific preparations in that regard . . .* or when officers prior to entry are

able to detect activity from within which leads them to reasonably conclude that the occupants are then engaged in the destruction or concealment of evidence . . . an unannounced entry may be justified. In these cases, however, compliance with the applicable knock-and-notice provision is excused not because of a blanket rule based on the type of crime involved but because the particular circumstances of the case give rise to a reasonable belief that immediate action is necessary to prevent the destruction of physical evidence.

(Italics ours. Citations omitted.)[2]

With the exception of the language which we have placed in italics, the quoted language is reflective of Washington law as it has been interpreted to date. We have rejected the "blanket rule" approved in some other jurisdictions[3] which permits police to make an unannounced entry based upon the general propensity of certain offenders, notably those dealing in narcotics or illegal gambling activities, to destroy evidence when confronted by police. *State v. Dugger*, 12 Wn. App. 74, 528 P.2d 274 (1974); *Coleman v. Reilly*, 8 Wn. App. 684, 508 P.2d 1035 (1973); *State v. Hatcher*, 3 Wn. App. 441, 475 P.2d 802 (1970).[4] Further, as in *State v. Young, supra*, it is well

---

[2]In *De Santiago*, the court was unable to excuse compliance with the "knock and announce" rule under any of the exceptions it noted in the quoted language.

[3]*See, e.g., People v. Lujan*, 174 Colo. 554, 484 P.2d 1238 (1971); *People v. Hartfield*, 94 Ill. App. 2d 421, 237 N.E.2d 193 (1968); *People v. De Lago*, 16 N.Y.2d 289, 266 N.Y.S.2d 353, 213 N.E.2d 659 (1965); *Henson v. State*, 236 Md. 518, 204 A.2d 516 (1964).

[4]As this court stated in *Hatcher* at page 446:

   Public concern about the traffic in narcotics makes judicial approval of the blanket no-knock search policy of the Seattle Police Department very tempting. But the protective constitutional moat which surrounds every man's home—his castle—may not be indiscriminately drained either by police policy or judicial fiat.

(Footnote omitted.)

   Other jurisdictions similarly have rejected the so-called "blanket" rule. *See, e.g., State v. Daniels*, 294 Minn. 323, 200 N.W.2d 403 (1972); *State v. Mendoza*, 104 Ariz. 395, 454 P.2d 140 (1969); *People v. Gastelo*, 67 Cal. 2d 586, 432 P.2d 706, 63 Cal. Rptr. 10 (1967).

   Oregon appears to have adopted an "intermediate position." *State v.*

settled in this jurisdiction where police are reasonably able to conclude that evidence *is being* or *is about to be destroyed,* "exigent and necessitous circumstances" may exist which permit the police to make an unannounced entry or to take whatever other action is "reasonable" to secure the evidence. This rule has been strictly applied. *State v. Lowrie,* 12 Wn. App. 155, 528 P.2d 1010 (1974); *State v. Miller,* 7 Wn. App. 414, 499 P.2d 241 (1972); *State v. Hatcher, supra.* As this court recently stated in *State v. Lowrie, supra* at page 157:

> The purpose of the general rule is to insure that an individual's right to privacy within his home will not be arbitrarily violated. An individual should be given an opportunty to be apprised of an officer's authority, of his purpose, and be permitted a reasonable opportunity to voluntarily admit the officer into his home. An equally important purpose for the rule is to protect the officer himself. The unannounced breaking and entering of a private dwelling could easily lead an individual to believe his safety, and that of his family, was in peril, causing him to take violent defensive measures which he otherwise would not have taken had he known a warrant had been issued to search his home.

Thus, in each case in which the possible destruction of evidence has been at issue, an unannounced entry has been sustained, or strict compliance with the "knock and announce" rule otherwise has been excused, only where it has appeared that the police were apprised of some contemporaneous and unambiguous sound or activity which alerted them to the probable imminent or actual destruction of evidence. *See, e.g., State v. Young,* 76 Wn.2d 212, 455 P.2d 595 (1969) (screaming and running); *State v. Neff,* 10 Wn. App. 713, 519 P.2d 1328 (1974) (odor of marijuana; defendant's attempt to block officers' entry); *State v. Singleton,* 9 Wn. App. 399, 512 P.2d 1119 (1973) (retreating face at window; sounds of running).

In this case, the response to the police officer's knock at

*Gassner,* 6 Ore. App. 452, 488 P.2d 822 (1971). *See State v. Smith,* 10 Ore. App. 404, 500 P.2d 269 (1972).

the door was silence. Necessarily, the State must be arguing that under the rule in *De Santiago*, where the police have prior knowledge that the particular suspect's method of disposing of evidence is by swallowing, silence itself is unambiguous. *See State v. Young, supra.* In effect, the State contends that "exigent and necessitous" circumstances existed before the police ever went to the appellant's motel room and that therefore strict compliance with the "knock and announce" rule should be excused.

It appears that the *De Santiago* rule is analogous to a rule which we previously have recognized in situations where the police have reasonable cause to believe, at least partially based upon prior knowledge, that a particular suspect is armed or otherwise able to threaten the safety of the police and that he will do so. In such situations, an entry inconsistent with the strict "knock and announce" requirements may be permissible. *See State v. Wilson*, 9 Wn. App. 909, 515 P.2d 832 (1973); *State v. Toliver*, 5 Wn. App. 321, 487 P.2d 264 (1971). At the same time, however, if the facts of a particular case indicate that any reasonable apprehension by police for their safety should have been dispelled by the time they made such an entry, the entry is illegal. *State v. Johnson*, 11 Wn. App. 311, 522 P.2d 1179 (1974). As we stated in *Toliver*, at page 326:

> The principle that officers are entitled to take action to protect themselves must necessarily be tempered, however, by a respect for the personal security and privacy of individuals which is secured by the Fourth and Fourteenth Amendments.

In the context of the foregoing, we conclude that the rule set forth in *People v. De Santiago, supra,* reasonably may be applied in Washington under certain circumstances. Thus, where the police, based upon reliable prior information, reasonably believe that a particular suspect will dispose of easily destroyed evidence in a silent or otherwise undetectable manner, "exigent and necessitous circumstances" may exist such that the police, armed with a valid search warrant, may be excused from strict compli-

ance with the "knock and announce" requirements. As should be apparent from our statement of this rule, however, it is subject to certain limitations, including the limitation of "reasonableness" imposed upon it by the Fourth Amendment. *Ker v. California,* 374 U.S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963); *State v. Young, supra.* Thus, the question next presented is whether the rule is applicable to the particular circumstances of this case such that we may approve the police action in question and thereby uphold the trial court's denial of the appellant's motion to suppress.[5]

Here, uncontradicted police testimony established that the police became aware of alleged narcotics dealings of the appellant Harris in early January 1972, and after learning of the appellant's location at the Century House Motel in Seattle on January 30, the police kept the appellant under almost constant surveillance until February 10, 1972, the date on which the search warrant in question was executed. In addition, Sergeant Beveridge testified at length concerning the affidavit supporting the search warrant, and, as we have determined elsewhere in this opinion, the affidavit was adequate to establish the reliability and personal knowledge of the police informants. It was in this context that Sergeant Beveridge testified that the police had received information that the appellant was going to make a delivery of heroin and that several police detectives intercepted the appellant during the course of the alleged delivery. Sergeant Beveridge further stated, in testimony we have previously set forth herein, that at the time the appellant was stopped by the police, he appeared to be chewing gum but that the police subsequently learned from a reliable informant that the appellant in fact had swallowed a condom containing heroin.

Under the circumstances of this case, we have determined that the police, at the time they executed the search warrant in question, reasonably believed that strict compli-

[5]In this connection, it is helpful to consider California decisions which have interpreted the rule as it was stated in *De Santiago.*

ance with the "knock and announce" requirements would result in the disposal of evidence because of their specific prior knowledge that the appellant would swallow evidence when confronted by police. The police had "particular information" about the behavior of the appellant indicating that he kept heroin rolled into condoms and that he previously had disposed of heroin stored in that manner by swallowing it when confronted by police, and therefore the police reasonably could infer that the appellant had "specifically resolved" to use that method of disposal in the future and had made "specific preparations in that regard." *People v. De Santiago,* 71 Cal. 2d 18, 29, 453 P.2d 353, 76 Cal. Rptr. 809 (1969); *see People v. Gonzales,* 14 Cal. App. 3d 881, 92 Cal. Rptr. 660 (1971), *cert. denied,* 404 U.S. 1002 (1971); *People v. Kahre,* 6 Cal. App. 3d 680, 86 Cal. Rptr. 291 (1970); *People v. Newell,* 272 Cal. App. 2d 638, 77 Cal. Rptr. 771 (1969).

In so evaluating the circumstances of the police entry in question, we recognize that the prior knowledge about the appellant, which the police possessed and upon which the State relies in seeking to sustain the police action, came from an informant. The California courts approach the matter of approving police action based solely upon an informant's tip with considerable caution, and so do we. *See People v. Bennetto,* 10 Cal. 3d 695, 517 P.2d 1163, 111 Cal. Rptr. 699 (1974); *People v. Dumas,* 9 Cal. 3d 871, 512 P.2d 1208, 109 Cal. Rptr. 304 (1973); *Parsley v. Superior Court,* 9 Cal. 3d 934, 513 P.2d 611, 109 Cal. Rptr. 563 (1973); *Guerrero v. Superior Court,* 2 Cal. App. 3d 136, 82 Cal. Rptr. 443 (1969); *Martinez v. Superior Court,* 273 Cal. App. 2d 413, 78 Cal. Rptr. 427 (1969); *People v. Marquez,* 273 Cal. App. 2d 341, 77 Cal. Rptr. 907 (1969). Nevertheless, we are of the opinion that the record in the present case adequately supports the conclusion, inherent in the trial court's oral ruling denying the appellant's motion to suppress, that the State met its burden to establish that the informant referred to by Sergeant Beveridge was reliable and spoke from personal knowledge. Specifically, the police

officer's testimony was totally uncontradicted and unimpeached.[6] *See People v. Gonzales, supra.* Further, it is apparent from the record that the trial court, having heard detailed testimony as to the intensive nature of the police surveillance of the appellant and the reliability of their informants, properly could infer that the police information as to the swallowing incident was reliable. In addition, the trial court reasonably could infer that the informant, in providing information to police as to a specific incident which they could partially corroborate, was speaking because of his personal knowledge of the informant's behavior on that occasion, and not because of a generalized belief that all offenders will attempt to dispose of evidence.

In short, at the time of the execution of the search warrant here in question, the police had specific and reliable knowledge that it was reasonably likely that the appellant would swallow evidence if confronted by police, and thereby dispose of it in a manner which could not be detected from outside of the appellant's room. Under such conditions, exigent and necessitous circumstances existed, and at the moment of the police entry, nothing had occurred to dispel the police officers' belief that the appellant would swallow evidence. *See State v. Johnson, supra.* Notwithstanding such considerations, testimony, which the trial court properly could believe, indicates that the police partially complied with the statutory and constitutional "knock and announce" requirements by knocking on the door, announcing their identity, and waiting 30 to 45 seconds before making their entry. We are unable to conclude that such police action violates any standard of reasonableness. *Ker v. California, supra; State v. Young, supra.* The trial court correctly denied appellant's motion to suppress evidence seized during the course of the police search.

■ Appellant's remaining assignments of error require

---

[6] We express no opinion as to whether the present record adequately would support a conclusion that the State met its burden to prove the reliability and personal knowledge of the informant if the police officer's testimony had been contradicted or impeached.

only summary treatment. Appellant claims the trial court erred in allowing witness Ann Beaman to express her opinion that the substance seized in Harris' apartment was heroin and that, under such circumstances, the State failed to prove the identity of that substance, and therefore the case should have been dismissed. Appellant contends that Ann Beaman's use of three screening color tests and one microcrystalline test to determine the nature of the substance was inadequate because none of these tests is specific. We disagree. Testimony indicates that the tests performed were sufficiently specific to justify the admission of their results into evidence. Appellant also argues that witness Beaman's testimony should have been excluded because she was unable to describe with certainty the quality of the test reagents inasmuch as she had not personally formulated them. This contention is without merit. *See State v. Hink*, 6 Wn. App. 374, 492 P.2d 1053 (1972). The qualification of an expert witness is within the discretion of the trial court, and any claimed deficiency in her testimony would affect the weight of such testimony, not its admissibility. *State v. Tatum*, 58 Wn.2d 73, 360 P.2d 754 (1961); *State v. Parker*, 9 Wn. App. 970, 515 P.2d 1307 (1973).

Finally, appellant assigns error to the refusal of the trial court on the second day of trial to grant a continuance to permit appellant to secure a certain witness who might testify as to deficiencies in the State's drug testing and identification procedures, and, specifically, those utilized by the witness Beaman. We can find no abuse of discretion. Appellant had over a year to prepare for the trial, including two continuances granted on defense motion, and otherwise had ample time to secure all necessary witnesses. The motion for continuance was not supported by a written affidavit and thus failed to make a proper showing of diligence. *See* RCW 10.46.080; *State v. Toliver*, 6 Wn. App. 531, 494 P.2d 514 (1972). Further, the possible testimony of the witness was to be offered only for the purpose of impeachment, and therefore it fails to qualify as evidence for which

a continuance ought to have been granted. *See State v. Mays*, 65 Wn.2d 58, 395 P.2d 758 (1964).

Affirmed.

HOROWITZ and CALLOW, JJ., concur.

Petition for rehearing denied April 10, 1975.

Review denied by Supreme Court June 9, 1975.

APPENDIX

IN JUSTICE COURT BEFORE .........................................., JUSTICE OF
THE PEACE IN AND FOR SEATTLE DISTRICT, KING COUNTY,
WASHINGTON

COMPLAINT FOR SEARCH WARRANT

No.    1807

STATE OF WASHINGTON  ⎫
                     ⎬  ss.
COUNTY OF KING       ⎭

COMES Now Sgt. Robert Beveridge, who being first duly sworn on oath complains, deposes and says:

That he has probable cause to believe and in fact does believe that in violation of the laws of the state of Washington, controlled substances as defined by law are being used, manufactured, sold, bartered, exchanged, given away, furnished or otherwise disposed of or kept, in, about and upon certain premises within King County, Washington designated and described as follows, to-wit:

Rooms 406 and 406A Century House Motel, 2224 - 8th Avenue, Seattle.

that affiant's belief is based upon the facts and circumstances as set forth in the attached affidavit which is incorporated by reference to this document.

/s/  Robert W. Beveridge

Subscribed and sworn to before me this 10th day of February, 1972.

/s/  Charles M. Stokes
     Judge, Seattle District,
     King County,
     Washington

Receiving of Complaint and Issuance
of Warrant Approved:
Christopher T. Bayley
Prosecuting Attorney
By  /s/  Gerald M. Lorentson

STATE OF WASHINGTON  ⎫
                     ⎬  ss.
COUNTY OF KING       ⎭

Sgt. Robert Beveridge being first duly sworn on oath deposes and says: that he is a sergeant attached to the narcotics unit of the Seattle Police Department;

That he is acquainted with a reliable informant who during the past month has provided information leading to the arrest and charging of three individuals for possession of heroin, and has given information which has led to the recovery of quantities of heroin and other controlled substances on more than six occasions during the past month;

That the informant is acquainted with and recognizes heroin and other controlled substances through said informant's long association with heroin users and dealers and through said informant's past involvement in heroin trafficking;

That said informant on about January 30, 1972, told your affiant that one DeWitt Harris was selling heroin from the Empire Motel in Seattle; that your affiant and other officers placed said motel under surveillance and observed steady traffic in and out of room #22, which was registered to DeWitt Harris;

That at the request of your affiant said informant contacted Harris and arranged for a delivery of heroin and that on February 3, 1972 your affiant observed Harris make a delivery of heroin to said informant, that said informant delivered said suspected heroin to your affiant, who turned it over to the laboratory, which determined that the substance was in fact heroin;

That it was later determined that Harris was selling heroin from the Royal Inn in Seattle because said informant was told by Harris that he was dealing from the Royal Inn, and said informant made arrangements for another delivery of heroin which was observed on February 8, 1972 by your affiant, that said delivery was made from a 1971 black Oldsmobile which was then followed for over two hours by a police helicopter during which time said vehicle made several stops, traveling throughout the central and southeast sections of Seattle, that the helicopter then ran out of gas and had to break surveillance;

That on February 9, 1972, your affiant and other officers went to the Royal Inn where they found that DeWitt Harris and another individual were registered in room #327, but had been evicted by the management earlier that date because of the large number of undesireable persons coming and going from the room, that the management then let your affiant and other officers into room #[3]27 where they recovered several condoms which contained a white powder residue, and a playing card, which is commonly used to measure heroin, with similar residue, that your affiant from his experience knows that condoms are commonly used for the transporting of wholesale quantities of heroin;

That during the morning hours of February 10, 1972, Sgt. J. Sanford of the same unit was contacted by a reliable informant who has been known to him for the past eight years and is well acquainted with heroin users and dealers; that this informant related to Sgt. Sanford that said informant had been in the residence of one "Johnson" located at 106 - 16th Avenue South, Seattle, unit six, during said morning

hours when Harris arrived in said Oldsmobile and delivered a quantity of heroin to the occupant of said unit; that Harris told said informant that he "now has his stash at MA 4-6820, Room #406"; that Sgt. Sanford then discovered that said phone number was the number of the Century House Motel, 2224 - 8th Avenue, Seattle;

That Det. Schrader of the narcotics unit then went to the Century House Motel and found that room #406 and the adjoining room 406A were registered to Harris and another, and at approximately 12:30 pm she observed said Oldsmobile parked in front of the Century House Motel; that she was informed by the manager that there had been an extensive amount of traffic to and from said rooms during the morning hours of February 10, 1972, and that while Det. Schrader was in the manager's office she observed three persons go to room #406, remain briefly, and leave the motel;

That Det. Donald Poindexter of the narcotics unit is acquainted with a reliable informant who has provided information for several years who on February 8, 1972, told Det. Poindexter that DeWitt Harris was selling heroin from the Royal Inn Motel;

That for the above mentioned reasons your affiant believes a controlled substance to-wit: heroin, to be on the premises located in rooms #406 and 406A of the Century House Motel, 2224 - 8th Avenue, Seattle, Washington.

/s/   *Robert W. Beveridge*
Sgt. Robert Beveridge

Subscribed and Sworn to before me this 10th day of February, 1972.
/s/   *Charles M. Stokes*
Judge, Seattle District Court, King
County, Washington, sitting as a
Magistrate.