[No. 5824-7-III. Division Three. March 7, 1985.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT
CARL ALLYN, *Appellant.*

*Sid Wurzburg,* for appellant (appointed counsel for appeal).

*E. R. Whitmore, Jr., Prosecuting Attorney,* and *James E. Freeley, Deputy,* for respondent.

GREEN, C.J.—Robert Allyn appeals his conviction of possession of a controlled substance, marijuana. He challenges the court's denial of his motions to (1) suppress the marijuana; (2) change venue, excuse certain jurors for cause and sequester the jury; and (3) grant a continuance. We affirm.

Allyn was arrested after a search of his residence by federal agents from the Bureau of Alcohol, Tobacco and Firearms and officers from the Wenatchee Police Department. The search was conducted at 8 a.m. on January 7, 1983, pursuant to a warrant which authorized entry without compliance with the knock and announce statute, RCW 10.31.040.[1] The warrant was based primarily on the reported observations of Robert Nelson III, an undercover

---

[1]RCW 10.31.040 states:

"To make an arrest in criminal actions, the officer may break open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure, if, after notice of his office and purpose, he be refused admittance."

The warrant was inscribed, "This warrant may be executed with out [*sic*] notice and under the 'no knock' procedure—in order to insure preservation of the evidence sought and safety of officers executing this warrant."

law enforcement officer who had contacts with Allyn and Michael Burns between November 1982 and January 1983. The officers forcibly entered the residence from both the front and back doors. Their search revealed marijuana throughout the house.[2] Firearms and counterfeit controlled substances were also seized.

Allyn challenges the issuance of the search warrant on several bases which are primarily directed to the validity of advance authorization to enter without complying with the knock and announce statute, RCW 10.31.040. Noncompliance with that statute is justified by exigent circumstances; *i.e.,* facts which cause a genuine concern for the officer's safety or that contraband will be destroyed before it can be seized. *State v. Jeter,* 30 Wn. App. 360, 634 P.2d 312 (1981). The validity of advance authorization for noncompliance with this statute based on exigent circumstances has been a subject of dispute. *Compare State v. Spargo,* 30 Wn. App. 949, 639 P.2d 782 (1982) *and State v. Jeter, supra* (exigent circumstances can only be justified with facts found at the scene) *with* 2 W. LaFave, *Search and Seizure* § 4.8(g) (1978) (the preferred procedure is to present the facts to a magistrate). We need not, however, address this issue because we agree with the trial court's conclusion following the suppression hearing that notwithstanding the advance authorization, there was independent justification for the officers' failure to knock and announce.

██ *State v. Coyle,* 95 Wn.2d 1, 10, 621 P.2d 1256 (1980) states exigent circumstances may arise in two types of settings:

(1) police have specific prior information that a suspect has resolved to act in a manner which would create an exigency, or he has made specific preparations to act in

---

[2]Bags of marijuana were found on a kitchen counter top or tabletop, in a dining room closet in which miscellaneous personal papers belonging to Allyn were also found, and the bedrooms used by Burns and Allyn. Marijuana seeds were also found in Allyn's bedroom. At least 10 marijuana plants ranging from seedlings to 4 to 5 feet tall were found under grow lights in an upstairs kitchen. Hashish was also seized from another room.

such a manner; . . . (2) police are "confronted with some sort of contemporaneous sound or activity alerting them" to the possible presence of an exigent circumstance.

(Citations omitted.) The court's findings at the suppression hearing are not challenged and are thus verities. *State v. Christian*, 95 Wn.2d 655, 628 P.2d 806 (1981). Those findings state:

4. That during December, 1982 and the early part of January, 1983, the said Nelson, III, also observed in the defendant's residence numerous firearms, including but not limited to, a Ruger .22 caliber rifle, two M–1 rifles, a .270 caliber rifle, a .22 caliber rifle and a Ruger .44 caliber pistol.

5. That on December 20, 1982, while in the defendant's residence, the defendant told Nelson, III, that "a lot of pigs should be shot" and that Officer Ron Crist should have his "fingernails pulled out".

6. That on December 27, 1982, while in the defendant's residence, a co–occupant of the residence, Michael Burns, told Nelson, III, that if the police ever tried to serve a search warrant on the defendant's residence, the defendant would "shoot first".

7. That on December 30, 1982, while in the defendant's residence after target practice shooting with Burns, the said Nelson, III, observed the defendant load a .22 caliber rifle and place it near the front door and that said rifle was observed by Nelson, in the same location, on subsewuent [*sic*] visits to the defendant's residence, including Nelson's last visit to said residence which was on January 6, 1983.

8. That the defendant's residence was also occupied by three dogs, one [G]erman shepherd, one part [G]erman shepherd and one [I]rish setter and said dogs acted as a doorbell, barking and sounding alarm as persons approached the defendant's residence.

9. That on January 3, 1983, while in the defendant's residence, Nelson, III, was told by the defendant that he would like to torture some police officers, that some police officers should be killed, and that everytime he was harassed by the pigs he went out and bought another weapon.

10. That on January 5, 1983, while in the defendant's residence, the said Nelson, III, observed several hand and

long guns located on the couch in the living room and that shortly thereafter said firearms had been removed to another unknown location.

11. That the defendant was with Warren Shill in May, 1979 when Shill pointed a rifle while inside his vehicle across the street from a tavern and fired it, killing a customer as he exited the tavern.

12. That the defendant was convicted in September, 1981 of the crime of Unlawful Delivery of a Controlled Substance while armed with a deadly weapon and during the commission of that crime gave a co–defendant, Eric Hughes, a handgun, telling him to "use it" if he had to while arming himself with another handgun.

13. That the defendant was convicted in January, 1982 of the Federal crime of conspiracy to possess an unregistered firearm and that this crime concerned the bombing of a police car, police officer['s] garage and the Chelan County Courthouse.

. . .

19. That the officers would not have complied with the requirements of RCW 10.31.040 and would have entered the defendant's residence by force even if the magistrate had not excused in advance compliance with RCW 10.31-.040 because there were no facts intervening at the time the warrant was executed that would lead the officers to believe their safety was no longer in peril.

The court's findings establish that Allyn and his co–resident, Michael Burns, kept weapons in the residence and had a propensity to use them; hence, the first circumstance set forth in *Coyle* is satisfied. One purpose of the knock and announce statute is to protect both the citizen and police from needless violence. As noted in *State v. Young,* 76 Wn.2d 212, 215, 455 P.2d 595 (1969), it must be reasonably applied or it becomes an empty formality. Under the circumstances, it would be unreasonable to require the officers to give advance notice of the warrant's execution. *See State v. Harris,* 12 Wn. App. 481, 492, 530 P.2d 646 (1975); *State v. Wilson,* 9 Wn. App. 909, 915–16, 515 P.2d 832 (1973); *State v. Toliver,* 5 Wn. App. 321, 326, 487 P.2d 264 (1971). The motion to suppress was properly denied.[3]

---

[3]Allyn's arguments that the court was not neutral or detached and the war-

Allyn's next assignments of error relate to pretrial publicity and newspaper articles in 1981 and 1982 concerning prior convictions for unlawful delivery of a controlled substance and conspiracy to possess unregistered firearms arising from pipe bombings of a police car, a private residence, and the Chelan County Courthouse. In addition, some of the earlier articles contained reference to Allyn's involvement in the Free People's Party, the platform of which was opposition to gun control and legalization of drugs. Voir dire of prospective jurors concerning their knowledge of these articles was extensive. Allyn unsuccessfully moved for a change of venue and to have the jury sequestered during trial. He challenges the court's refusal to grant these motions in addition to the refusal to excuse certain jurors for cause. He argues he was prejudiced as a matter of law because some of the articles exposed the jurors to his prior crimes which would not be admissible at trial. He further argues because of the extensiveness of the publicity concerning the former charges as well as the instant charge, which allegedly continued through trial, there was a substantial likelihood none of the jurors could be impartial.

Allyn cites no cases to support his argument that knowledge alone by a prospective juror of an accused's prior criminal conduct is per se prejudicial and is ipso facto grounds for disqualification. The cases he cites, *State v. Mack,* 80 Wn.2d 19, 490 P.2d 1303 (1971); *State v. Dinges,* 48 Wn.2d 152, 292 P.2d 361 (1956), involve the admission of a criminal defendant's prior crimes *by the prosecution during trial.* Here, any knowledge the jurors may have had about Allyn's crimes was not the result of evidence introduced at trial. *State v. Parnell,* 77 Wn.2d 503, 506, 463

---

rant was not executed under oath or affirmation because the court considered unsworn testimony and information previously acquired through prior contacts with Allyn need not be addressed in light of our decision. The affidavits clearly establish probable cause. Further, we agree with the court's conclusion that there was no evidence the magistrate issuing the warrant was not neutral or detached and any information received which was not subject to oath was directed to the method of executing the warrant, which we treat as superfluous.

P.2d 134 (1969), cited by defendant, discusses the difference and potential impact between a juror's viewing evidence at trial (in that case a preliminary hearing) and reading newspaper accounts:

> The setting and the purpose are entirely different. The witnesses testifying at a preliminary hearing are under oath and subject to the pains and penalties of perjury. Such testimony must of necessity make a different impression on an observer than would reading a newspaper or hearing a newscast.

In this day of rapid and intensive communication, it will be rare indeed to find jurors so insulated from the outside world as to have no knowledge of events reported in the media. Sterile jurors will rarely exist. Thus, *mere* knowledge of a news account about an accused by a juror should not be a ground for automatic dismissal for cause.

 Disqualification of a juror is a question for the trial court based on whether, under all the circumstances, it is apparent the juror cannot disregard his or her opinion and judge the case impartially. RCW 4.44.150–.190. Hence, the issues raised here concerning publicity relating either to Allyn's prior convictions or the instant one require a review of the record to determine the probability of prejudice to Allyn. The test for juror disqualification is incorporated into the considerations applicable to changes of venue or sequestration:

> (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*State v. Jamison*, 25 Wn. App. 68, 70, 604 P.2d 1017 (1979),

*aff'd,* 94 Wn.2d 663, 619 P.2d 352 (1980); *see also State v. Heath,* 35 Wn. App. 269, 666 P.2d 922 (1983); *State v. Cunningham,* 27 Wn. App. 834, 836–37, 620 P.2d 535 (1980), *review denied,* 95 Wn.2d 1010 (1981); *State v. Warwick,* 16 Wn. App. 205, 555 P.2d 1386 (1976). Our independent review of the record here leads us to conclude the court's discretion was not abused. *See State v. Stiltner,* 80 Wn.2d 47, 55, 491 P.2d 1043 (1971); *State v. Warwick, supra* at 208.

The news articles were primarily factual. Although many of the articles appeared in the Wenatchee World which is well circulated in the area, only four of the articles in the record referred to Allyn's involvement in the instant case; the remainder were up to almost 3 years old. There was extensive voir dire of the prospective jurors, 52 were questioned, and Allyn exercised all of his peremptory challenges. Except for two prospective jurors who were excused because of the *State's* peremptory challenges, the court excused for cause those who had specific recollections concerning the prior crimes. The jurors finally selected either did not know Allyn or had only a vague recollection of seeing his name in the newspaper. Some thought the news articles pertained to his arrest where drugs were involved. Others thought he ran for public office. One thought his name was connected with a drunk driving charge. None had any strong recollection of what the articles were about.

Our review of the record convinces us the court did not abuse its discretion in refusing to excuse potential jurors for cause. Further, there is no evidence here that Allyn was in effect tried by the news media or community prejudice was so great as to give rise to a reasonable likelihood that the jurors were prejudiced against him. *See State v. Stiltner, supra.* Nor is there evidence publicity intensified after trial began or that any of the jurors read the newspaper or listened to the radio contrary to the court's admonishments. *See State v. Heath, supra* at 271. We, therefore, find no error.

Next, Allyn contends the court erred in refusing to grant a continuance or, pursuant to RCW 10.40.060, a 24–hour period to enter a new plea after the State was permitted to amend the information. The information was amended to change the date on which defendant was alleged to have possessed marijuana from December 28, 1982, to January 7, 1983. Allyn maintains the amendment was material because he had a valid defense that the State could not prove he possessed marijuana on the initial date. We disagree.

An information may be amended without rearraignment if substantial rights of the defendant are not prejudiced or the amendment is one of form, not substance. CrR 2.1(d); *State v. Hurd,* 5 Wn.2d 308, 312, 105 P.2d 59 (1940); *State v. Pisauro,* 14 Wn. App. 217, 218, 540 P.2d 447 (1975). It is not an abuse of discretion to refuse to grant a continuance if the "principal element in the new charge is inherent in the previous charge and no other prejudice is demonstrated . . ." *State v. Gosser,* 33 Wn. App. 428, 435, 656 P.2d 514 (1982). Here, the elements of the crime charged remained the same before and after the amendment. Only the date was changed which has been held not to be material where, as here, no alibi is claimed. *State v. Forler,* 38 Wn.2d 39, 42, 227 P.2d 727 (1951).

Further, it is inconceivable that Allyn was prejudiced by the amendment. The entire hearing on the motion to suppress, which was heard before the State moved to amend, centered around the search of the residence on January 7. The amendment was one of form, not of substance. There was no error.

Finally, Allyn contends statements by the prosecutor during closing argument in combination with other alleged errors during trial amounted to cumulative error warranting reversal. We have reviewed the record and find the evidence against Allyn to be so overwhelming that the errors claimed could not have changed the result. Therefore, error, if any, is harmless.

Affirmed.

MUNSON and McINTURFF, JJ., concur.

Review denied by Supreme Court May 24, 1985.