[No. 46093. En Banc. September 11, 1980.]

THE STATE OF WASHINGTON, *Petitioner*, v. JAMES JOSEPH DAUGHERTY, *Respondent*.

*C. Danny Clem, Prosecuting Attorney,* and *Ronald A. Franz, Deputy,* for petitioner.

*William G. Knudsen* of *Kitsap County Public Defender,* for respondent.

WILLIAMS, J.—Respondent James Joseph Daugherty was convicted in Kitsap County Superior Court on charges of second degree burglary and second degree theft. Division Two of the Court of Appeals reversed, holding that the trial court improperly denied Daugherty's motion to suppress evidence seized by the police at his home. *State v.*

*Daugherty*, 22 Wn. App. 442, 591 P.2d 801 (1979). The issue presented is whether, during a warrantless search of a driveway, the safe which was seen by one of the officers through an open garage door was improperly admitted into evidence. We hold its seizure improper and affirm the Court of Appeals.

At about 4:30 on the morning of May 12, 1977, an officer of the Poulsbo police department was on routine patrol when he encountered respondent parked with his pickup truck near the offices of the Dungeness Oyster Company. Respondent indicated to the officer that he had been drinking and that he intended to leave his truck there for the rest of the night and go to the nearby apartment of a friend. The officer then continued on his patrol.

Shortly before 8 o'clock that morning, the oyster company's employees arrived for work and discovered that the office had been broken into and the company safe was missing. The safe had apparently been removed by hand truck through a smashed–in door to a storage area. Respondent, a night driver for the company, had a key to an outside door which led to the same storage area.

The employees immediately called the Poulsbo police to the scene of the burglary. After conducting a preliminary investigation and learning of respondent's presence at the building several hours earlier, Officer Patterson, who was in charge, and three other officers drove out to respondent's home near Bremerton, several miles away. Patterson testified he took the three officers along with him partly as a training exercise, as they had been on the force for only about 2 weeks. None of the three were armed or in uniform, since they were not yet qualified under department regulations to carry a gun.

When they arrived at respondent's home, the officers observed respondent's pickup and an old former Army truck backed up against the open door to the garage. Officer Krebs immediately got out of the car and without direction from Patterson walked down the right side of the driveway. At the same time, respondent came out from behind the

trucks and met Officer Patterson at a point in front of the trucks near the entry to the driveway. Patterson told respondent he was investigating a burglary and asked if he could look around. Respondent said no and asked if he had a warrant. Patterson replied by telling respondent, "You know you are on probation."

While respondent was confronting Patterson, Officer Krebs proceeded to the back end of the two trucks near the opening of the garage. He testified this maneuver was necessary "in case the suspect would flee or if there was additional suspects." He added that from his experience on the Los Angeles Police Department he always took an alternate route from his fellow officers in the event a gun battle ensued or a suspect fled, so "you could be in a position that you would take action if he came your direction."

Krebs then noticed what appeared to be a safe partially protruding from a tarpaulin in the garage. Although he thought it was a safe, he did not know if it was the one taken in the burglary. Nevertheless, he called to Officer Patterson and told him to cuff respondent, which was done immediately. Patterson shouted to Krebs, "Is it here?" and Krebs answered, "Yes." Respondent was at that time placed under arrest. The officers removed the tarpaulin from the safe and satisfied themselves that it was the one taken from the Dungeness Oyster Company office. Patterson then searched respondent's house, but found nothing of an incriminating nature. Sergeant Cook arrived shortly thereafter, and he likewise searched respondent's house and found nothing.[1]

██ Both the warrantless entry into respondent's garage and the seizure of the safe within fall under the fundamental rule announced in *Katz v. United States,* 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967):

---

[1]Even assuming a valid arrest, both searches of respondent's residence were patently impermissible. *Chimel v. California,* 395 U.S. 752, 763, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969) (a warrantless search incident to an arrest is limited to the arrestee's person and the area within his immediate control).

[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well–delineated exceptions.

(Footnotes omitted.) Since there was no warrant in the present case, the officers' conduct is proper only if it falls within one of the "jealously and carefully drawn" exceptions to the warrant requirement of the Fourth Amendment. *Jones v. United States,* 357 U.S. 493, 499, 2 L. Ed. 2d 1514, 78 S. Ct. 1253 (1958).

■ The State argues that seizure of the safe was permissible under the "plain view" exception to the warrant requirement. The cornerstone of the plain view doctrine is *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971), in which the Supreme Court stated, at page 466:

What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

This rule has often been commented upon by the courts of this state. The rule as stated requires: (1) a prior justification for intrusion, (2) an inadvertent discovery of incriminating evidence, and (3) immediate knowledge by the police that they have evidence before them. *State v. Lesnick,* 84 Wn.2d 940, 942, 530 P.2d 243 (1975); *State v. Murray,* 84 Wn.2d 527, 533–34, 527 P.2d 1303 (1974); *State v. Dimmer,* 7 Wn. App. 31, 33, 497 P.2d 613 (1972).

Applying the law to the facts of this case, it is clear that the officers' warrantless seizure of the safe from respondent's garage was unlawful unless the officers had a prior justification for the intrusion onto respondent's property and the discovery of the incriminating evidence was inadvertent.

The first question is: Did the officer have a lawful right to be in the place from which he viewed the safe? The safe was first observed from Officer Krebs' vantage at the base of the driveway, just outside the garage. If the driveway itself is not an area in which respondent had a reasonable expectation of privacy, then respondent could not expect that the police would refrain from entry upon it. *Smith v. Maryland,* 442 U.S. 735, 740, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979); *Rakas v. Illinois,* 439 U.S. 128, 143, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978). *And see Katz,* at 351–52.

The extent of expectation of privacy in a driveway is determined in any case under a test of reasonableness in light of such characteristics as the exposure of the driveway to the street and surrounding public areas, the use of the driveway for common access to the house, and the nature of the official incursion complained of. *United States v. Magana,* 512 F.2d 1169, 1171 (9th Cir. 1975).

Photographs of the driveway to respondent's house show that it is exposed to view from the street and is a means of conventional access to the attached house. The driveway is therefore not protected under the Fourth Amendment either from view by police officers or from an incursion by officers with a legitimate purpose walking across it to reach respondent at the door to his home. *Magana,* at 1170–71; *State v. Corbett,* 15 Ore. App. 470, 516 P.2d 487 (1973). On the other hand, as is similarly apparent from the photographs, respondent's entire driveway is not a pathway to his house. When respondent parked his two vehicles at the rear of his driveway, in effect blocking and obscuring from view the remaining portion of the driveway and the interior of the garage, he had a subjective expectation that a small

squad of police officers would not thread around and among the vehicles in an effort to meet him at his door. *Magana,* at 1170–71. Moreover, the expectation revealed by respondent's action is certainly an objectively legitimate one which "society is prepared to recognize as 'reasonable.'" *Katz,* at 361 (Harlan, J., concurring).

We need not determine whether the driveway became a protected area at the front of respondent's vehicles, or at the point where the officers first strayed substantially from a normal pathway directly to respondent. It is clear, however, that by the time Officer Krebs completed his "flanking action" around petitioner to the right of the truck, he had entered such an area. *Magana,* at 1171. At this point, if the intrusion was not lawful, neither was the subsequent seizure.

 The State contended at the suppression hearing that the intrusion was lawful because there were "exigent circumstances" requiring safety precautions against the chance a concealed accomplice might present a danger to the officers. The trial court agreed, concluding the officers' suspicion that an accomplice was involved was reasonable. While the findings of the trial court following a suppression hearing are of great significance to a reviewing court, the constitutional rights at issue require us to make an independent evaluation of the evidence. *State v. Agee,* 89 Wn.2d 416, 419, 573 P.2d 355 (1977); *State v. Byers,* 85 Wn.2d 783, 786, 539 P.2d 833 (1975); *State v. Smith,* 72 Wn.2d 479, 481, 434 P.2d 5 (1967).

 There is no question that police officers are entitled to take minimal precautions to insure their safety. Thus, they may "stop and frisk" a suspect when there are specific and articulable facts to support a suspicion that the person may be armed and dangerous. *Terry v. Ohio,* 392 U.S. 1, 21–22, 30, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Moreover, a limited search of premises subsequent to an arrest may be permissible to protect the safety of the officers and prevent interference with the arrest. *State v. Toliver,* 5 Wn.

App. 321, 326, 487 P.2d 264 (1971); *United States v. Blalock,* 578 F.2d 245 (9th Cir. 1978).

As the basis for the officers' belief that an accomplice was present, the State points to evidence that: (1) the size and weight of the safe taken in the burglary was such that it was too large for one person to move, and (2) the door to the office where the safe was located was kicked in, a result that could not ordinarily be accomplished by one person. We do not believe that the record supports the State's conclusion.

The evidence revealed that the safe was 24 by 24 by 19 inches in size, weighed approximately 125 pounds, and was on casters. It further showed that it was moved from the office on a hand truck or dolly, which one person could easily have managed alone. The kicked-in door was hollow and of wood construction. There was one footprint on the door next to the handle. In addition, Sergeant Cook testified he saw the respondent at 4:30 a.m. in the parking lot of the Dungeness Oyster Company prior to the burglary, and he was alone at that time. There was *no evidence* that more than one person was involved.

It is thus apparent that the officers could not reasonably believe that more than one person was involved in the commission of the burglary. They may have had a vague hunch but no "specific and articulable facts" to support it. *Terry,* at 21.

Moreover, there was no reasonable basis for believing that if in fact there were an accomplice, he was present when the police arrived at respondent's residence. It had been nearly 6 hours since the commission of the crime, and respondent's house was located in or near Bremerton, several miles from the scene of the crime at Poulsbo.

■ Even assuming for the sake of argument that the officers had reasonable grounds to believe an accomplice was involved, their stated purpose for going to respondent's house and their conduct while there clearly demonstrate that they intruded onto the protected area of respondent's

driveway not as a safety precaution but to search for evidence. If Patterson really believed there might be some danger to him or the other officers, it seems inconceivable that he would take unarmed and inexperienced officers as protection against the possibility of being endangered by a hidden accomplice. Further, it is difficult to imagine that Patterson would send unarmed men into an area where he had reason to believe a dangerous felon was hiding.

A more likely explanation for the officers' intrusion onto the property comes from Patterson's own testimony. He testified that he knew a safe had been taken in the burglary and he "believed" respondent had committed the crime, but he did not have enough evidence to make an arrest. It was therefore essential that he find evidence linking respondent's truck with the crime. In this regard, he testified as follows:

Q. One of your intentions in terms of going to Mr. Daugherty's house was in terms of looking around the area, was it not? A. It was to look at his vehicle only. Q. To look at his vehicle? A. That is correct. Q. What in particular? A. The bed of the truck, particularly around the tailgate area. Q. And did you know what you were looking for? A. Yes. Q. What was that? A. Striations, marks, anything that indicated a heavy load that was either dragged on or dragged off; particularly black paint. Q. Did you believe before you arrived at Mr. Daugherty's house that you had probable cause to arrest him for the offense? A. Only if I—only if I found that evidence which I just stated.

The officers' conduct was consistent with that purpose. They entered the driveway over respondent's objection. Once on the property, Krebs immediately went to the area where he could examine the back of respondent's pickup for the evidence, which, once seized, provided an ostensible basis for the arrest and subsequent search for further evidence.

The officers' entry into the area behind respondent's truck was in fact a pretext to conduct an exploratory search of it and the garage in the hope that they would discover

evidence of the burglary. *State v. Michaels,* 60 Wn.2d 638, 645, 374 P.2d 989 (1962). Discovery of any evidence in the course of such a search is not "inadvertent" as is required for the plain view doctrine to apply. *Coolidge v. New Hampshire,* 403 U.S. 443, 471, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). It follows that the inadvertence element of the exception was likewise absent in this search.

Since the State has failed to sustain its burden of showing the warrantless search fell within one of the exceptions to the warrant requirement of the Fourth Amendment, the search cannot be justified, and the motion to suppress the evidence should have been granted. *Arkansas v. Sanders,* 442 U.S. 753, 760, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979). The decision of the Court of Appeals is accordingly affirmed.

ROSELLINI, BRACHTENBACH, DOLLIVER, and HICKS, JJ., concur.

UTTER, C.J. (dissenting)—I dissent. The majority's characterization of the issue is correct: if the officers' warrantless seizure of the safe in Daugherty's garage was unlawful absent a lawful prior search and intrusion by the officers notwithstanding their clear view of the safe from outside of the garage, the evidence should be suppressed. Conversely, if the officers' seizure followed such a lawful prior intrusion upon an area protected under the Fourth Amendment, during which the safe was inadvertently discovered, then the seizure itself is lawful, since the safe had obvious evidentiary value. Whether the intrusion was in fact lawful depended upon whether there were exigent circumstances justifying the officers' flanking action around Daugherty to the right of the truck. If the officers' testimony is accepted, their subsequent discovery of the safe was inadvertent, satisfying the requirement in *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971), that the discovery of the evidence must be inadvertent. *Coolidge,* at 471.

The trial court heard two officers' testimony of their concern for an accomplice and their practice intended to protect themselves from attack. It found the officers' testimony to be credible. This finding is entitled to special weight inasmuch as the trial court typically has the opportunity to hear and observe the officers who carried out the challenged search and seizure and is in the best position to determine their credibility, as compared to the reasonableness of their conduct. We should not disregard the trial court's finding unless the record compels a contrary view that the officers' testimony is not credible. This record does not compel such a contrary view although there is testimony, which the trial court heard, that could justify a contrary conclusion.

While an independent evaluation of the evidence may be justified by this court as asserted by the majority, it should not ignore the trial court's unique opportunity to determine whether the officers subjectively feared an accomplice was present and whether the belief was reasonable. Any other standard places us in the same indefensible position that existed prior to *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

Although an appellate court in a search and seizure case must conduct its own independent evaluation of the evidence, the trial court's findings on the reasonableness of the officers' actions are entitled to great weight on appeal, because the trial court had an opportunity to observe the officers and gauge their credibility.

A review of the record to determine what evidence exists to support the trial court's finding discloses evidence of Daugherty's presence at the oyster company, his recent employment by the company, and likelihood of his having a key to the outer door, though not the broken office door. This justified the officers' prompt investigation of his possible involvement. Reports of the size of the safe, and inferentially, its weight, as well as certain damage done to the office door, could have fairly suggested to the officers

the participation of an accomplice. While a different conclusion could be reached from that evidence, as the majority so concludes, the evidence does not compel a different conclusion, and the majority, in a case where it could not evaluate the candor of the witnesses, is simply substituting its view of the officers' subjective beliefs for that of the trial judge without the opportunity to hear their testimony and determine their credibility. This is not and should not be the function of an appellate court.

Upon arriving at Daugherty's house to pursue their investigation in these circumstances, the officers were entitled to take minimal precautions to assure their safety. In *State v. Toliver*, 5 Wn. App. 321, 487 P.2d 264 (1971), the court reasoned that the need of the police to assure their safety, recognized as justifying a "stop and frisk" in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), similarly may justify other intrusions otherwise barred by the Fourth Amendment. In that case the court held police officers' entrance into a house subsequent to an arrest was justified by reliable information that the arrested man's associates within the house were armed with guns and would use them to protect their friend, and the officers then hearing a commotion inside the house after the arrest. The police then entered after those inside had disregarded their warning to emerge.

The circumstances of *Toliver* are different from those existing here in that the officers in that case had more specific and reliable evidence of a potential threat to their safety. However, the intrusion sought to be justified in that case was also more extreme than that at issue here. Different degrees of intrusiveness require different degrees of justification. *Terry v. Ohio, supra* at 18 n.15.

A closer fact pattern is found in *United States v. Blalock*, 578 F.2d 245 (9th Cir. 1978). There, following arrest of the defendant in his shop for trafficking in narcotics, a police officer quickly checked behind the counter as part of an "eyeball search" of the front room of the shop for accomplices. The court approved this limited cursory check,

during which the heroin was discovered, as necessary for the safety of the arresting officers. *United States v. Blalock, supra* at 248.

While I would not hold the type of evidence confronting the officers in this case would justify the type of invasion executed by the officers in *Toliver,* I do believe the evidence taken in light of reasonable police practice justifies the type of limited cursory check approved in *Blalock.* I would hold that where an officer approaches a felony suspect and has good reason to believe the suspect is accompanied by an accomplice, the officer may permissibly perform a limited and cursory search of the immediate area from which the officer may be the target of gunfire. This holding would comport with the essential reasoning of the court in *Terry v. Ohio, supra,* and its progeny, in that the permissible search must be limited in scope and only for the purposes of securing the safety of the investigating officers.

Having found substantial evidence to support the trial court's finding that the officers' intrusion was permissibly made for their asserted reasons, I would find consistent with *Coolidge* that the safe was permissibly seized thereafter, and properly introduced into evidence at Daugherty's trial.

I would reverse the judgment of the Court of Appeals and reinstate the trial court's judgment convicting the defendant on charges of second degree burglary and second degree theft.

WRIGHT and HOROWITZ, JJ., and BRITT, J. Pro Tem., concur with UTTER, C.J.