[Nos. 16954–8–I; 17824–5–I. Division One. January 26, 1987.]

THE STATE OF WASHINGTON, *Respondent*, v. GERALD L. HANSON, *Appellant.*

*In the Matter of the Personal Restraint of* GERALD L. HANSON, *Petitioner.*

*Richard Hansen, David Allen,* and *Allen & Hansen,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for respondent.

COLEMAN, J.—Gerald Hanson appeals his conviction, upon a jury verdict, of one count of first degree assault. We reverse and remand for a new trial.

On the evening of January 22, 1985, Gerald Hanson went to a lounge in Mill Creek for a drink. He was served by a waitress, Susan Hopkins, who knew him from prior visits to the lounge.

During the evening, he struck up a conversation with two other customers, Carol Strickland and Sherry Sherer. As the lounge closed, Hanson walked out to the parking lot with Strickland and Sherer. When it appeared that Sherer was having trouble driving, Strickland and Hanson agreed that it would be a good idea for Hanson to follow Sherer's car to make sure she arrived home safely. Hanson followed what he believed was Sherer's silver Mercedes as she left the parking lot. After following the silver car into the town of Snohomish, where it stopped at the Oxford Tavern, Hanson realized that he had mistakenly followed the silver Firebird of the waitress, Susan Hopkins.

Hanson entered the Oxford Tavern after Hopkins. Once inside, Hopkins asked him, "What the hell are you doing following me? . . . You scared me." Hanson explained that he thought he was following Sherer's car. This exchange was witnessed by Candy Clements, the bartender at the Oxford Tavern, and her boyfriend, Dennis Gilleland. After Clements heard this conversation, she noted that Hanson was driving a blue car, and she wrote down the license plate number. Hanson remained at the tavern until approximately 1 a.m.

On that same evening, Karen Zacher was the sole clerk on duty at a 7–Eleven store in the town of Snohomish. At

2:10 a.m., a man entered the store, paid for a soda, and then pulled out a gun and shot Zacher in the abdomen. As Zacher tried to get away, the assailant shot again, this time missing her. Zacher saw the assailant turn, run out of the store, and drive off in a blue car.

About this time, Clements and Gilleland left the Oxford Tavern and stopped at the Snohomish 7–Eleven. As they entered the parking lot, they saw a blue car pull out. Gilleland then entered the store, discovered that Zacher had been shot, and provided assistance until the police and medical aid arrived.

When an officer arrived at the scene, he mentioned to Clements that he saw a blue car shortly before he received the call about the shooting. Clements told the officer that she had seen a blue car earlier in the evening at the Oxford Tavern, and she gave the officer the number of Hanson's license plate.

During the early morning hours, Clements and Gilleland worked with a Snohomish police officer to prepare a composite of Hanson, the person who had followed Hopkins to the Oxford Tavern. A few hours later, the same officer interviewed Karen Zacher in the hospital in order to prepare a composite of her assailant.

The next day, Zacher was shown a photographic montage which included Hanson's picture. She chose Hanson's picture as the one who looked most like her assailant, but stated that she could not be sure. Two days after the shooting, Zacher was shown a videotape lineup and chose Hanson as her assailant. Over 2 months later an in–person lineup was held, and Zacher again identified Hanson as her assailant.

On April 8, 1985, Hanson was charged by information with the offense of first degree assault. On May 31, 1985, the court[1] held a hearing on a motion to suppress the identifications. The motion was denied. After trial before a jury,

---

[1] The motion to suppress the identifications was heard by the Honorable Daniel Kershner. The trial was held before the Honorable John Wilson.

Hanson was found guilty as charged.

On appeal, Hanson argues the trial court erred in (1) allowing the prosecutor to cross–examine him regarding fiction he had written, (2) admitting the victim's identifications of him as the assailant, (3) refusing to allow an officer to testify as to his opinion about the photo montage, and (4) refusing certain expert testimony on memory and eyewitness identification.[2]

### DEFENDANT'S FICTIONAL WRITINGS

Hanson testified on direct examination that he had never committed a crime, even a misdemeanor. He stated that although he had served in the Army in Vietnam, he had never killed anyone. On cross examination, the State questioned Hanson about fiction he had written which contained some incidents of violence.[3]

---

[2]Hanson also argues, both on direct appeal and through a personal restraint petition, that he was denied effective assistance of counsel at trial. Because we hold that a new trial is required, we find it unnecessary to address this argument. The personal restraint petition is therefore denied pursuant to RAP 16.4(d).

[3]"Q. [By Mr. Kurtz] Mr. Hanson, you described yourself as basically a person who is involved in the medical sales field, is that correct?

"A. Yes, sir.

"Q. Have you aspired to any other vocation in recent years?

"A. No.

"Q. You haven't taken a stab at perhaps becoming a writer?

"A. I believe that's an avocation, not a vocation.

"Q. Not a full–time job but something that you would like to do?

"MR. WOLFF: Your Honor, I am going to object at this time and ask for a side–bar at this point. It is irrelevant from what the testimony that's been given at this point.

"THE COURT: I will take a side–bar.

"(Side–bar conference not reported.)

"Q. Mr. Hanson, you have done some writing in your spare time, correct?

"A. Yes, I have.

"Q. Now you described yourself as a person who is basically a nonviolent sort?

"A. I don't believe that I made any description of my violence or nonviolence at this trial.

"Q. Well, I guess I wasn't necessarily referring to the trial. You have indicated here that in the trial you have never hurt anyone?

"A. Not since playground scufflings.

"Q. But you have certainly been exposed to violence in your lifetime?

Outside the presence of the jury, the defendant moved for a mistrial, arguing that questions about his fiction were improper because (1) his character for nonviolence was not yet in issue, (2) his fiction was not a specific instance of prior misconduct, and (3) any questions about his fiction were irrelevant and prejudicial. The court denied the motion, ruling that "the questions were probative, since they dealt with the area of violence and non–violence, which subject matter was developed extensively in direct examination, so it was proper cross–examination . . ."

On appeal, Hanson contends that questions regarding his fiction were irrelevant to his character for nonviolence.

---

"A. I have seen the results of violence.

"Q. Have you thought about violence?

"A. I see it every night on television. Yes, I think about it a lot of the time.

"Q. And isn't it true that you have written about violence?

"A. I have written a certain part of a novle [sic] and a very, very small portion of that contained an incident of violence.

"Mr. Kurtz: Your Honor, perhaps we may have a side–bar at this time.

"(Side–bar not reported.)

"Q. (Mr. Kurtz) I believe, Mr. Hanson, you have indicated that you have written about violence, is that correct?

"A. Yes.

"Q. Some of your writings have focused on violence. You have written about, talked about violence involving Viet Nam veterans?

"A. Yes, sir.

"Q. You have also, isn't it true, you sketched out some writings involving a widower who remarries and then the new wife turns on him and that man becomes violent?

"A. No, sir. In this little sketch he thought to have violence done, a half paragraph on a page (gesturing).

"Q. You haven't—

"Mr. Wolff: I am going to object to this particular point. I'd like a quick side–bar.

"The Court: Counsel, side–bar.

"(Side–bar not reported.)

"The Court: Proceed.

"Q. (Mr. Kurtz) Mr. Hanson, you have heard the phrase that a writer should basically write what he knows about, right? What you know?

"A. I don't believe I have ever heard that phrase.

"Q. Do you see anything, any parallels autobiographical in your writings?

"A. The novel about the Viet Nam thing?

"A. Yes."

Furthermore, he argues, the inquiry was particularly preju-
dicial in this case. Absent an obvious reason why Hanson
would have committed the crime, the jury may have seized
on the correlation between certain elements of his fiction
and aspects of his personal life,[4] to conclude that Hanson
was a violent person who was likely to commit this violent
crime.

The admissibility of character evidence is governed by
ER 404(a)(1), which states:

(a) **Character Evidence Generally.** Evidence of a
person's character or a trait of his character is not
admissible for the purpose of proving that he acted in
conformity therewith on a particular occasion, except:

(1) *Character of Accused.* Evidence of a pertinent trait
of his character offered by an accused, or by the prosecu-
tion to rebut the same;

When a defendant has placed his character in issue, he
may be cross–examined as to specific acts unrelated to the
crime charged. *State v. Bauman,* 77 Wn.2d 938, 940, 468
P.2d 684 (1970); *State v. Riconosciuto,* 12 Wn. App. 350,
354, 529 P.2d 1134 (1974). However, the information sought
must be relevant[5] with respect to the character trait in
issue. ER 402. Even if relevant, the evidence may be
excluded if its probative value is substantially outweighed
by the danger of unfair prejudice.[6] In this context, "unfair

---

[4]The prosecutor asked Hanson about writings "involving a widower who
remarries and then the new wife turns on him and that man becomes violent". On
direct examination, Hanson testified that he was a widower who had remarried,
and that he and his second wife had been planning to divorce at the time the
crime was committed.

[5]ER 401 provides:
"'Relevant evidence' means evidence having any tendency to make the exis-
tence of any fact that is of consequence to the determination of the action more
probable or less probable than it would be without the evidence."

[6]ER 403 provides:
"Although relevant, evidence may be excluded if its probative value is sub-
stantially outweighed by the danger of unfair prejudice, confusion of the issues, or
misleading the jury, or by considerations of undue delay, waste of time, or need-
less presentation of cumulative evidence."

prejudice" means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. *State v. Cameron*, 100 Wn.2d 520, 529, 674 P.2d 650 (1983).

▮ Assuming arguendo that the defendant placed his character for nonviolence in issue during his direct testimony, we hold that his writings were irrelevant to rebut this character evidence. Without some further foundation,[7] the defendant's writings were simply not probative. A writer of crime fiction, for example, can hardly be said to have displayed criminal propensities through works he or she has authored.

Even if we were to assume that Hanson's writings were probative of his character, any probative value would be overwhelmed by the danger of unfair prejudice. The crime charged was a random, brutal act of violence for which there was no apparent motive. By suggesting that the defendant's character conformed to the violent acts in his writings, the State supplied the jury with an improper explanation for why the defendant would have committed the crime charged.

The most similar case our research has disclosed is *United States v. Giese*, 597 F.2d 1170 (9th Cir.), *cert. denied*, 444 U.S. 979, 62 L. Ed. 2d 405, 100 S. Ct. 480 (1979), in which the prosecutor cross–examined the defend-

---

[7]There may be instances when a defendant's fictional writings would be admissible. For example, they may qualify for admission under ER 404(b):

> **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

When evidence is admitted under this portion of the rule, it must be shown to be logically relevant, and its probative value must be shown to outweigh its potential for prejudice. *State v. Coe*, 101 Wn.2d 772, 777, 684 P.2d 668 (1984); *State v. Saltarelli*, 98 Wn.2d 358, 362, 655 P.2d 697 (1982).

In this case, the State never indicated how the defendant's writings were logically relevant under ER 404(b). There was no attempt to show, for example, that Hanson wrote about an incident so similar to the crime charged that his writings were relevant to the question of identity.

ant using a book he had read. Giese, who was charged with conspiring to bomb recruiting centers during the Vietnam war, had allegedly met some of the coconspirators in connection with a bookstore he had founded. When Giese took the stand, he introduced several books on direct examination, describing each book and stating that they were representative samples of the books he had read or had stocked in his bookstore. The prosecutor proceeded to cross–examine Giese about the contents of a more radical book that Giese admitted that he had read.

A divided court held that the government's use of the book on cross examination was proper. The holding, however, was very narrow:

> [T]he question before this court is not whether we think books are a persuasive form of character evidence; the issue is whether the government had a right to respond once the defendant had, of his own volition, chosen that method of proving he was a peaceable, law–abiding individual.
>
> . . .
>
> Justice would not have been served had the jurors been left with only the one–sided impressions created by Giese's 18 innocuous books. To show the opposite side of the coin, as it were, it was fair for the government to cross–examine Giese on other books he had sold, owned, or read.

*Giese,* at 1190–91.

The decision drew a strong dissent.

> No inference of any kind can be drawn about a person's character from the kinds of books that he reads. We have no basis in human experience to assume that persons of "good" character confine their reading matter to "good" books, or that persons who read peaceful books are peaceful people, or that persons who read books involving violence are violent people.

*Giese,* at 1207 (Hufstedler, J., dissenting).

In the present case, we cannot rely on the rationale stated by the majority in *Giese.* Unlike Giese, Hanson never put forth his writings as an example of his nonviolent character. Thus, his writings are probative only if we accept

the proposition that an author's character can be determined by the type of book that he writes. Because we reject this proposition, and because the circumstances of this case made the introduction of Hanson's writings highly prejudicial, we reverse and remand for a new trial.

IDENTIFICATION PROCEDURES

Hanson challenges three procedures which resulted in identifying him as the assailant: (1) a composite prepared several hours after the shooting; (2) a photographic montage shown to the victim the next day; and (3) a videotape lineup shown to the victim 2 days after the shooting.

█ In order to determine the admissibility of the identifications, we examine each procedure to determine whether, under the totality of the circumstances, it was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968). Reliability is the linchpin in determining the admissibility of these identifications. *Manson v. Brathwaite,* 432 U.S. 98, 114, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977). The factors to be considered include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the prior description of the criminal, the level of certainty demonstrated at the confrontation, and the length of time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. 188, 199–200, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972). Against these factors is to be weighed the corrupting effect of any suggestive aspects of the identification. *Manson,* 432 U.S. at 114. In sum, the validity of an identification procedure is generally a question of fact for the jury. *State v. Smith,* 37 Wn. App. 381, 385, 680 P.2d 768 (1984); *State v. Lane,* 4 Wn. App. 745, 750, 484 P.2d 432 (1971). An identification will be inadmissible only when its reliability is so questionable that it cannot offset the suggestiveness of the procedures. *See, e.g., State v. McDonald,* 40 Wn. App. 743, 700 P.2d 327 (1985).

We first examine the alleged suggestiveness involved in the preparation of the victim's composite of her assailant. A few hours after the shooting, an officer interviewed the victim at the hospital in order to prepare a composite of the suspect. The officer used a Smith and Wesson Identikit, an aid which allows the police to create a composite by superimposing plastic transparencies of various facial features. The officer asked the victim a series of questions about the assailant so that he could put together an initial composite. After forming this initial composite, the officer showed it to the victim so that she could examine the features and adjust them by trying different transparencies. The victim was unsatisfied with the composite but "didn't know how to explain to [the officer] to make it right." The police then posted the composite at the nurse's station so that no one resembling the composite would be allowed into the victim's room.

Hanson directs us to the similarities between the composite prepared by Clements and Gilleland (which admittedly represents Hanson) and the composite prepared by the victim. He argues that the two composites are nearly identical,[8] a result so improbable that the officer must have assembled the initial transparencies for the victim's composite using transparencies already chosen by Clements and Gilleland.

 Even assuming that the officer assembled the composite using the features chosen by Clements and Gilleland,[9] we would not necessarily invalidate the identifica-

---

[8]The transparency for each feature is coded. When the transparencies have all been assembled to produce a composite, the codes for each feature are visible at the bottom. The codes in this case reveal that the two composites use the same transparency for the subject's nose, lips, ears, hair, and chin. The eyebrow transparency is the same for both composites except that it is placed lower on the forehead in the victim's composite. The only salient differences between the composites are the glasses and age lines which appear on the composite prepared by Clements and Gilleland.

[9]We note that at the suppression hearing the court found that the victim prepared the composite with the aid of the officer. Because we determine that this

tion. Such a procedure would be equivalent to a single suspect identification, which, while disfavored, *Stovall v. Denno,* 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967), is not per se invalid. *Manson v. Brathwaite, supra;* *State v. Rogers,* 44 Wn. App. 510, 515, 722 P.2d 1349 (1986); *State v. Booth,* 36 Wn. App. 66, 70–71, 671 P.2d 1218 (1983). The reviewing court must still undertake the balancing process outlined in *Manson.*

Under the unusual circumstances of the present case, the preparation and use of the composite was not so suggestive as to require us to remove the identification from the jury's consideration. Often, a single suspect identification is suggestive because the very act of showing the witness one suspect indicates that the police have focused their attention on that person. In contrast, the victim in this case believed that the composite was based entirely on her own description of the assailant; she was not influenced to accept the initial composite as an accurate representation of the suspect. Although in general, single suspect identifications are suggestive, the instant case reveals "little pressure on the witness to acquiesce in the suggestion that such a display entails." *Manson,* 432 U.S. at 116.

Hanson also challenges the photographic montage as impermissibly suggestive. After viewing the photo montage, we agree that it has some suggestive features. Hanson was one of only two subjects photographed with Polaroid film, and the subjects vary in age and appearance more than is desirable. The differences between the two types of photo paper are minimized, however, because the photos are covered in such a way that essentially only the subject's face is displayed. In addition, while the subjects in the photo montage varied in appearance, these variations did not

fact is not crucial to the validity of the identification procedure, however, we need not determine whether the court's finding was correct or whether an independent evaluation of the evidence leads us to a different conclusion. *See State v. Daugherty,* 94 Wn.2d 263, 616 P.2d 649 (1980), *cert. denied,* 450 U.S. 958, 67 L. Ed. 2d 382, 101 S. Ct. 1417 (1981); *State v. Dresker,* 39 Wn. App. 136, 692 P.2d 846 (1984).

suggest that Hanson was a more likely suspect than the others displayed. Finally, the victim testified that no one drew her attention to any of the photos and that she felt free not to pick any of the subjects displayed in the montage.

Hanson's challenge to the videotape lineup rests primarily on the procedure followed in showing the videotape to the victim. Hanson contends that the police directed the victim's attention toward him by stopping the film when he appeared. The testimony, however, indicates that the police asked the victim to watch the entire tape without comment, and that the tape was then run in its entirety twice. After the second complete viewing, the victim stated that number 4 (Hanson) looked most like the person who shot her. The police then asked her if she would mind looking at the subject again, and the tape was stopped at Hanson's face. After seeing Hanson again, the victim was sure he was the person who shot her. Under these circumstances, we find that the showing of the videotape was not suggestive. Although the police stopped the videotape on Hanson, this occurred only after the victim had independently focused her attention on him.

Our inquiry does not end, however, with examining any suggestiveness that may have occurred in these procedures. We proceed to weigh any suggestiveness against the factors which would indicate that the identifications were nonetheless reliable. Drawing upon the factors enumerated in *Manson,* we find that, despite any suggestive features, the identifications in this case were admissible. The victim had the opportunity to view her assailant for 2 to 3 minutes before he pulled out the gun. About 1 minute of this was a face–to–face viewing at a distance of 2 to 3 feet in a well lit building. As the victim stated at trial, "[h]e stood right across from me, and I stared at him when he shot me, and I know his face and what it looks like. I can't imagine any way that could have been wiped out of my memory when something that traumatic happens." The victim was highly attentive during the time she saw the assailant; she testified

that because she smelled alcohol on his breath when he came to the counter, she looked him over carefully. Admittedly, her initial description differed in some respects from Hanson, and she expressed some dissatisfaction with the initial composite, saying she was unable to "explain how to make it look right." When shown the photo montage, however, she chose Hanson's photo as the one who looked most like the person who shot her. At the videotape lineup, she was "positive" that Hanson was her assailant, saying "[T]hat's the one that reminds me the most. That's the one that makes my whole body shake." Finally, the reliability of the identifications is strengthened by the fact that all of the procedures at issue here took place within 2 days of the attack.

We agree with Hanson that the identification procedures used in this case were not ideal. Considering all of the factors, however, we believe that any weaknesses in the identifications can be adequately explored before the jury.

> "'[W]hile identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the 'integrity'—of the adversary process.
>
> "'Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.'"

(Footnote omitted.) *Watkins v. Sowders,* 449 U.S. 341, 348, 66 L. Ed. 2d 549, 101 S. Ct. 654 (1981) (quoting *Clemons v. United States,* 408 F.2d 1230, 1251 (D.C. Cir. 1968) (Leventhal, J., concurring).

### OFFICER'S TESTIMONY REGARDING PHOTO MONTAGE

The defense's cross examination of the officer who prepared the photo montage reads in part:

Q. [By Mr. Ferguson] And did you then—well, do you try and get not only people who look similar, but do you try and do it on the same type of photographic paper, in other words, all Polaroid, or all Kodak, or whatever?

A. Well, sometimes it is not possible to use, for instance, all Polaroid, or all Kodak paper. I try to, if that's the case, mix it, get it half and half, something like that. I would prefer to use all Polaroid or all Kodak to minimize those differences.

Q. Were you able to do that in this case?

A. No, I wasn't.

Q. Why is that?

A. Because of the fact that Chief Murphy had given me those pictures and told me to put together the montage.

Q. And then were you satisfied with these eight pictures?

A. No.

MR. KURTZ: Your Honor, again, I think the pictures speak for themselves.

THE COURT: Sustained. The jury will disregard the last answer. Proceed.

The defendant contends that the trial court erred when it sustained the objection and ordered the jury to disregard the officer's answer, arguing that the officer's testimony was admissible as an expert opinion. The State counters that the testimony was properly excluded because it would not have been helpful to the jury.

ER 702 provides:

**TESTIMONY BY EXPERTS**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ Although the rule gives the trial court discretion in determining the circumstances under which expert testimony will be allowed, *State v. Mak,* 105 Wn.2d 692, 715, 718 P.2d 407 (1986), we believe that under the facts of this case the inquiry should be permitted on retrial. The prosecutor is asking the jury to place reliance on the identification made through the photographic montage. The defense should be allowed to show that the very official who pre-

pared the montage had reservations about it. Because the reliability of an identification procedure is primarily a question for the jury's determination, *State v. Smith*, 37 Wn. App. 381, 385, 680 P.2d 768 (1984), the court should exercise its discretion in favor of admitting all factors relevant to the jury's assessment of this issue.

### EXPERT TESTIMONY ON EYEWITNESS IDENTIFICATION

The defendant proposed calling Dr. Edith Greene to testify about (1) memory and the factors affecting an eyewitness identification, and (2) an experiment she had conducted in which subjects were shown the photo montage from this case and asked to pick out the person who most resembled a description given by the victim. The trial court ruled that Dr. Greene could testify about the factors affecting acquisition of memory, but reserved ruling on other aspects of Dr. Greene's proposed testimony.

When the defendant renewed his proposal to call Dr. Greene, the court ruled that it would exclude the photo montage experiment, but stated that Dr. Greene could testify regarding the effects of stress and weapons' focus. With respect to the rest of the witness's proposed testimony, the court said Dr. Greene could speak only about "those things that lay people have misconceptions of". In light of the trial court's ruling, the defendant decided not to call Dr. Greene to testify.

On appeal, Hanson argues that the court abused its discretion in refusing to permit Dr. Greene to testify fully. Limiting Dr. Greene's testimony, Hanson contends, prevented the defense from adequately educating the jury on the possibilities of misidentification.

█ Washington courts have repeatedly stated that admission or refusal of expert testimony regarding eyewitness identification lies within the discretion of the trial court. *Mak*, at 715; *State v. Guloy*, 104 Wn.2d 412, 429–30, 705 P.2d 1182 (1985), *cert. denied*, 106 S. Ct. 1208 (1986); *State v. Jordan*, 39 Wn. App. 530, 542, 694 P.2d 47 (1985); *State v. Cook*, 31 Wn. App. 165, 174, 639 P.2d 863 (1982);

*State v. Barry,* 25 Wn. App. 751, 761, 611 P.2d 1262 (1980); *State v. Brown,* 17 Wn. App. 587, 596–97, 564 P.2d 342 (1977). Expert testimony of this kind should be allowed, however, when (1) the identification of the defendant is the principal issue at trial, (2) the defendant presents an alibi defense, and (3) there is little or no other evidence linking the defendant to the crime. *State v. Moon,* 45 Wn. App. 692, 726 P.2d 1263 (1986).

In the present case, the trial court did not abuse its discretion in refusing to allow Dr. Greene to testify about the photo montage experiment she conducted. As the State points out, the experiment was structured so as to be irrelevant to the identification made in this case. The experimental subjects were instructed to choose a photo from the photo montage based on the victim's description of her assailant. This was not comparable to the victim's task of choosing a photo based on her own memory of the assailant.

We are unable to determine from the trial court's ruling, however, exactly how much of the rest of the expert's testimony would have been excluded. On retrial, counsel may reoffer the testimony of an expert on eyewitness identifications. The trial court should then define the boundaries of the expert testimony in harmony with the recent case of *State v. Moon, supra.* Because of the crucial nature of uncorroborated eyewitness identifications in this case, the court should exercise its discretion liberally in allowing expert testimony regarding the factors affecting the reliability of such identifications.

Reversed and remanded for a new trial.

GROSSE and PEKELIS, JJ., concur.

Review denied by Supreme Court March 31, 1987.