[No. 23444–7–I.  Division One.  April 2, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. MARVIN BELL, *Appellant.*

---

*Julie A. Kesler, Andrew Zinner,* and *Anna–Mari Sarkanen* of Washington Appellate Defender Association, for appellant.

*Norm Maleng, Prosecuting Attorney, Donna L. Wise, Senior Appellate Attorney,* and *William Lansing Downing, Deputy,* for respondent.

SWANSON, J.—The defendant, Marvin Bell, appeals his conviction for first degree robbery. He challenges the trial court's ruling excluding certain aspects of expert testimony on eyewitness identification and the trial court's selection of an interpreter for the victim at trial. We affirm.

By amended information filed October 26, 1988, Bell was charged with first degree robbery. The following facts were established at trial.

On August 9, 1988, at approximately 8 a.m., Nafisa Zarif was severely beaten and robbed of her purse while walking home after visiting her husband at Providence Hospital. Although Zarif was the only witness to the attack, she gave police a detailed description of the man who robbed her and the large bag he was carrying. Zarif described the man to police as being a black male, about 30 years old, approximately 5 feet 10 inches tall, with a slender build, short Afro hairstyle, long face, and wearing a horizontally striped blue and white T–shirt. While answering a question by the robber immediately before his attack, Zarif was able to observe him from a distance of approximately 2½ feet. Zarif also told police that she thought she had seen him in the neighborhood before and that he might live north of the hospital.

On the afternoon of August 15, 1988, Zarif was with her husband at Providence Hospital when she recognized her attacker (Bell) pass in the opposite direction in the hallway. Security was contacted and Zarif identified Bell for them from a distance of 7 or 8 feet while he was talking on a telephone. The police were contacted and Zarif identified Bell as her attacker in front of police. When Zarif saw Bell in the hospital, she was certain that he was her attacker. Bell was then arrested and taken into custody.

During an interview with police after his arrest, Bell stated that at 8:30 a.m. on August 9, 1988, he had been

doing his laundry at a residence located at 928 32nd Avenue and that his friends Selma Slate and Gil Thomas had been present. Bell also gave a telephone number for this address. Upon investigation, the telephone number was found to have been disconnected and no one living at the address recognized the names given by Bell. At trial, a horizontally striped blue and white T–shirt was admitted and identified by Zarif as being similar to the one worn by her attacker. An old girl friend of Bell's testified that she had retrieved this shirt from Bell's belongings and given it to police.

Gil Thomas testified that on August 9, 1988, he lived at 928 31st Avenue and that until 3 weeks prior to that time Bell had lived there for about 8 months. Thomas testified that he woke up about 9:30 a.m. on August 9, 1988, and found Bell there watching television and doing laundry. According to Thomas, on the morning of August 9, 1988, Bell was wearing a blue and white T–shirt identical to the one in evidence.

Thomas also testified that Bell's new residence is in some "downtown apartments" near Prefontaine Square. The investigating police testified that the likely route Bell took from his home to his stated destination on the morning of August 9 went past the back of Zarif's apartment, where the crime occurred. This detective also testified that during an interview Bell told him that he is 32 years old, 5 feet 9 inches tall, and 155 pounds.

Prior to trial, Bell made an offer of proof utilizing Dr. Robert Croyle regarding human memory and eyewitness identification. Following the offer of proof, the trial court ruled that portions of Dr. Croyle's testimony were admissible, but excluded certain aspects of his testimony.

Following trial, the jury found Bell guilty as charged. This appeal timely followed.

EXPERT TESTIMONY ON EYEWITNESS IDENTIFICATION

Bell first argues that the trial court abused its discretion by excluding part of Dr. Croyle's testimony regarding eyewitness identification.

■■ The refusal to admit expert testimony on eyewitness identification is within the discretion of the trial court. *State v. Ward,* 55 Wn. App. 382, 384, 777 P.2d 1066 (citing *State v. Coe,* 109 Wn.2d 832, 843, 750 P.2d 208 (1988), *review denied,* 113 Wn.2d 1029 (1989). The admission of expert testimony is governed by ER 702:

> If scientific, technical, or other specialized knowledge will *assist the trier of fact to understand the evidence or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(Italics ours.) Admissibility under this rule depends upon "'whether (1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact.'" *State v. Moon,* 45 Wn. App. 692, 696, 726 P.2d 1263 (1986) (quoting *State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984)). When determining whether the expert testimony will be helpful to the trier of fact, the court must consider the underlying purpose of expert testimony: "'to assist the finder of fact in understanding the evidence and determining a fact in issue.'" *Ward,* 55 Wn. App. at 384 (quoting *Moon,* 45 Wn. App. at 696); *see also* ER 702.

■ This court has recognized three factors that may be considered in determining whether a trial court's exclusion of expert testimony on eyewitness identification falls within the "very narrow range of cases" constituting an abuse of discretion:

> (1) where the identification of the defendant is the principal issue at trial; (2) the defendant presents an alibi defense; and (3) there is little or no other evidence linking the defendant to the crime.

*Ward,* 55 Wn. App. at 385 (quoting *Moon,* 45 Wn. App. at 697); *see also State v. Taylor,* 50 Wn. App. 481, 749 P.2d 181 (1988); *State v. Johnson,* 49 Wn. App. 432, 743 P.2d 290 (1987), *review denied,* 110 Wn.2d 1005 (1988); *State v. Moon,* 48 Wn. App. 647, 739 P.2d 1157 (1987); *State v. Hanson,* 46 Wn. App. 656, 731 P.2d 1140, *review denied,* 108 Wn.2d 1003 (1987). However, the presence of all three of these factors does not mandate automatic reversal. *Ward,* 55 Wn. App. at 385. Rather, these factors merely provide guidance for determining whether there has been an abuse of discretion. *State v. Ward, supra.*

> On review, this court must also consider the reasons given by the trial court for excluding the expert testimony and consider the particular facts of each case. An abuse of discretion will only be found in those "few exceptional cases" that also involve fact patterns that are "close and confusing, and which 'cry out' for an explanation".

(Citations omitted.) *Ward,* 55 Wn. App. at 385 (citing *State v. Johnson,* 49 Wn. App. at 438–40). If the trial court's reasons for excluding the expert testimony are "fairly debatable", exercise of its discretion will not be reversed on appeal. *Ward,* 55 Wn. App. at 386; *see also Taylor,* 50 Wn. App. at 487 (quoting *Walker v. Bangs,* 92 Wn.2d 854, 858, 601 P.2d 1279 (1979)).

Here, the three *Moon* factors appear to be present: (1) the principal issue at trial was the identification of Bell; (2) Bell relied completely on an alibi defense; and (3) the only evidence linking Bell to the crime is the eyewitness identification by Zarif. Therefore, this court must consider the trial court's reasons for excluding the expert testimony to see if they are "fairly debatable" and review the particular facts of this case to see if they are "close and confusing" and "cry out" for an explanation. *See Ward,* 55 Wn. App. at 385–86.

This case presents a model of carefully exercised use of discretion by the trial court. After hearing the offer of proof, the trial court individually addressed each aspect of Dr. Croyle's testimony, giving well–supported reasons for excluding or admitting the testimony. The trial court

excluded only certain aspects of Dr. Croyle's testimony regarding eyewitness identification. Dr. Croyle was allowed to testify regarding how memory works, the effect of situational stress generally, the effect of the passage of time, and cross–racial identification. However, the trial court excluded Dr. Croyle's testimony regarding unconscious transference (identifying someone you have seen before under other circumstances), the impact of eyewitness identification on juries, the duration of observation, and the impact of chronic stress on an individual. In excluding the testimony on unconscious transference, the trial court found the theory to be "anecdotal" and not supported by a large body of scientific evidence. Further, the court indicated that no evidence was presented indicating that transference occurred here. Regarding the impact of eyewitness testimony on juries, the court believed that such testimony would "not be helpful to the fact finder" and would invade the deliberative process. In excluding testimony on the duration of observation, the trial court noted that this was within the common experience of jurors. Finally, regarding the impact of chronic stress on a specific individual, the trial court found that Dr. Croyle had failed to identify what specific factors related to chronic stress result in memory loss. Further, the court noted that the impact of distractions and anxiety were within the jurors' common experience and that the jurors should make their own evaluations based on their own observations and the testimony.

A review of the transcript of Dr. Croyle's pretrial offer of proof supports the conclusion that these reasons are "fairly debatable" and, therefore, exclusion of the testimony was not an abuse of the trial court's discretion. Regarding unconscious transference, Dr. Croyle testified that "[t]here are a variety of different theories about accounting for that process", that "it is still the subject of a lot of research", and that in studies in unconscious transference the evidence is mostly anecdotal. Further, the offer of proof failed to include any testimony indicating how unconscious transference was applicable to this case. Based upon this record,

it is fairly debatable whether unconscious transference is based upon an explanatory theory generally accepted in the scientific community. Further, without testimony indicating how the theory is applicable to this case, it is debatable whether such testimony would be helpful to the trier of fact.

The trial court's reason for excluding testimony regarding the impact of eyewitness identification on juries is also fairly debatable. The underlying purpose of expert testimony is to assist the fact finder in understanding the evidence and determining a fact in issue. *Moon,* 45 Wn. App. at 384. Testimony on this subject would appear to invade the province of the jury, especially when limited expert testimony on other aspects of eyewitness identification is permitted.

Admissibility of testimony on the duration of observation is also fairly debatable. Dr. Croyle testified that most people know that a longer period of observation affects memory. Therefore, the trial court could reasonably find that such knowledge was within the common experience of the jurors.

Finally, we cannot say that the trial court abused its discretion in excluding expert testimony regarding the impact of chronic stress on a specific individual. Dr. Croyle testified that chronic stress and anxiety can impair memory to some degree. Dr. Croyle also testified that because chronic stress can vary so much in its level, he was "reluctant to endorse the notion of chronic stress being a factor." Dr. Croyle would only go so far as to agree that "the level of chronic stress *seems* to influence the degree to which memory is impaired." (Italics ours.) Based on this testimony, it is fairly debatable whether this testimony is based upon an explanatory theory generally accepted in the scientific community. Also, because of the indefinite nature in which the theory was presented, it is fairly debatable whether testimony on the subject would be helpful or merely confusing to the jury.

Additionally, the facts of this case are not so "close and confusing" as to "cry out" for an explanation. First, Bell was at a house in the general area of the crime near the time of the crime. Second, a police officer testified that Bell's probable route from his home to his friend's house would have taken him near the scene of the crime near the time the crime occurred. Third, Zarif identified one of Bell's shirts as being similar to the shirt worn by her attacker. Fourth, this shirt fit the description Zarif gave to the police, immediately after the crime, of the shirt worn by her attacker. Fifth, Bell's friend testified that Bell was wearing this shirt while doing laundry on the morning of the crime. Sixth, Zarif's attacker was carrying a large bag; Bell had been taking his laundry to a friend's house to wash it. Seventh, Zarif had been able to observe her attacker's face while answering his question prior to the attack. Eighth, Zarif's description of her attacker closely matched Bell's actual description. When all of these factors are combined, we cannot say that the issue of eyewitness identification "cries out" for any further explanation than was permitted by the trial court. Accordingly, we find no abuse of discretion by the trial court in excluding those portions of Dr. Croyle's testimony that were excluded here.

### Appointment of Interpreter

Bell also challenges the trial court's appointment of an interpreter for Zarif. Fariba Taghavi was appointed by the trial court as an interpreter for Zarif at trial. At the time of trial, Taghavi was actively involved as a victim's advocate for the Seattle Police Department's Victim Assistance Unit. Bell argues that because of this involvement, the trial court abused its discretion by appointing Taghavi as an interpreter for a victim of a crime.

Whether a person is too interested in a proceeding to be qualified as an interpreter is ordinarily within the discretion of the trial court. *State v. Boulet,* 5 Wn.2d 654, 660, 106 P.2d 311 (1940). Exercise of discretion will only be disturbed upon a showing of abuse. *State v. Treveno,* 10

Wn. App. 89, 94–95, 516 P.2d 779 (1973), *review denied,* 83 Wn.2d 1009 (1974).

Bell relies upon *Prince v. Beto,* 426 F.2d 875 (5th Cir. 1970), to illustrate an abuse of discretion here. The crime involved in *Prince* was burglary with the intent to commit rape. The trial court appointed the victim's husband as the victim's interpreter at trial. The appellate court ruled that this constituted fundamental unfairness and violated due process. In reaching this decision, the court noted that appointing a husband to interpret for a wife would normally, at most, be an abuse of discretion. However, the court noted that in *Prince,* the facts of the case crossed the line from tolerable imperfection "into the field of fundamental unfairness." These facts included the effect of this type of crime on the husband's ability to remain unbiased, the husband was an intensely interested party, the defendant alleged that the husband had attempted to extort money from him in exchange for stopping the prosecution, and there was difficulty in eliciting from the husband the true and correct interpretation of the witness' answers for consideration by the jury.

The present case is clearly distinguishable from *Prince.* First, there is no indication in the record that Taghavi has a personal interest in the outcome of this case or that this crime personally affects her. Second, there was no evidence of wrongdoing or untrustworthiness on the part of Taghavi. Third, there is no indication in the record that Taghavi had any difficulty in providing a true and correct interpretation of Zarif's answers. Further, Taghavi was specifically instructed by the trial court that all questions and answers were to be translated exactly, without editorial comment or interpretation on her part. Accordingly, we cannot find any potential bias such that the trial court's appointment of

Taghavi as an interpreter would constitute an abuse of discretion.

We affirm.

COLEMAN, C.J., and PEKELIS, J., concur.